Earl SIMMONS, Plaintiff-Appellee-
Cross Appellant,

v.

William R. KING and Ace Freight Lines,
Inc., Defendants-Appellants-
Cross Appellees,

Earl Dubose, d/b/a Dubose Trucking
Company, Defendant.

No. 72-2608
Summary Calendar.*
United States Court of Appeals,
Fifth Circuit.

April 12, 1973.

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Company of New York, et al., 5 Cir., 1970, 431 F.2d 409, Part I.

858

Bob Ray, Sam Wilkins, W. Edward Ellington, Lawrence J. Franck, Jackson, Miss., for appellants.

Pat H. Scanlon, Jackson, Miss., for appellee.

W. Thad Cockran, Velia Ann Mayer, Jackson, Miss., for Dubose.

Before JOHN R. BROWN, Chief Judge, and DYER and SIMPSON, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The easiest thing in this case is how it happened. It was, or so it was thought, a simple rear-end collision at night between two heavily loaded tractor-trailer rigs on Interstate 55 near Hammond, Louisiana. But almost immediately, as a sort of land-based Donnybrook,[1] it got more and more com-

1. See, Grigsby v. Coastal Marine, 5 Cir., 1969, 412 F.2d 1011, 1969 A.M.C. 1513.

plex. The upshot is that we must determine how well the Mississippi forum court did with a Louisiana diversity case involving along the way overriding Federal Seventh Amendment problems and the force of Interstate Commerce regulations. Since we find two things which affect the result as to all, we reverse and remand for a trial on liability.

Earl Simmons, the driver of the vehicle which was rear-ended instituted a suit in the Court below against William R. King, the driver of the rear-ending vehicle, Dubose[2] and Ace[3] alleging that King was the mutual and joint agent of Dubose and Ace.[4] King and Ace answered separately but through a single spokesman denying that King was negligent, was the agent of Ace[5] and pleading affirmatively that Simmons was contributorily negligent [6] and that at the time of the accident King had been the agent of Dubose.[7] Not suprisingly Dubose answered by denying that King had been his agent and pleading affirmatively that King had been the agent of Ace, that the relationship of King to Dubose had been that of independent contractor and that Simmons had been contributorily negligent.[8]

### The Trial Outcome

At the trial, the District Judge peremptorily instructed the jury that (i) Simmons was not guilty of any contributory negligence but (ii) to find for Simmons against King and at least one of the other two Defendants, Ace and Dubose. He left to the jury the determination as to whether Ace or Dubose or both were vicariously liable for the acts of King. The jury proceeded to find for Simmons against King and Ace in the amount of $65,000, but found in favor of Dubose.

On King and Ace's separate motions the District Judge denied the motion for a J.N.O.V. but conditioned his denial of a new trial upon Simmons accepting a remittitur of $10,000. Simmons accepted the remittitur upon the condition that none of the Defendants appeal the reduced judgment. King and Ace promptly appealed and with his condition breached Simmons cross-appealed.

Of all the parties only Dubose was happy, happy, that is, with how things turned out below, but unhappy now at the prospect that, having been somehow dragged into this appeal of Simmons *vis a vis* King, Ace or both, he will lose the judgment of exoneration.

### What Went Wrong?

Fleeing from the burden of judgment King-Ace assert the Court below erred (1) by peremptorily instructing the jury (a) that Simmons was not guilty of any contributory negligence and (b) to find for Simmons against King and at least one of the other Defendants and (2) by failing either to instruct the jury that

2. Earl Dubose doing business as Dubose Trucking Company.

3. Ace Freight Lines, Inc.

4. Although King was regularly employed by Ace as a truck driver and the tractor-trailer rig which he drove was under a long-term lease to Ace, (under such a long-term lease, Ace is the owner for regulatory purposes, 49 C.F.R. § 1057.2) at the time of the accident the truck with driver was leased to Dubose for the purpose of transporting a load of sugar from Reserve, Louisiana to Memphis, Tennessee.

5. See note 6, *infra.*

6. In support of this affirmative defense King and Ace alleged that at the time of the accident Simmons' vehicle was being operated without proper tail lights, warning lights, and brake lights as required under Louisiana law (Louisiana Revised Statutes § 32:105) and that Simmons had stopped his vehicle suddenly without notice in such a manner as to constitute negligence (Louisiana Revised Statutes § 32:104, subd C.)

7. In support of this affirmative defense King and Ace alleged that the lease (see note 4, *supra*) was one required by the ICC and that at the time of the accident, pursuant to the lease, King and his vehicle were under the exclusive possession, control, and use of the operator-lessee Dubose.

8. Dubose's contentions were essentially the same as those of King and Ace (see note 6, *supra*).

**860**

Dubose was liable as a matter of law for the negligence of King or at least submit the issue to a jury. Simmons' cross-appeal urges error (3) in directing the remittitur of $10,000 and (4) in disallowing some items of Simmons' bill of costs. We sustain (1)(a), (2) and (3) and reverse and remand for a new trial on all issues.

### The Law Of Medes And Persians

The substantive law is, of course, that of Louisiana. This means that contributory negligence is a complete bar to recovery.[9] It also means that under its jurisprudence others (Ace, Dubose, or both) may be liable on civil principles akin to common law *respondeat superior*.

But what is not left to Louisiana or to Mississippi, the forum state, is the quantum of proof either to support or ignore a finding by a Seventh Amendment Federal jury, or the supremacy of valid regulations issued by a regulatory agency (ICC).

### Boeing The Test

The propriety of the trial Court's peremptory instructions turns on the now familiar, oft-cited standard adopted by this Court en banc.

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." Boeing v. Shipman, 5 Cir., 1969, 411 F. 2d 365.

And of course, we are often reminded (or remind ourselves as well as trial Judges) that "Issues of negligence and contributory negligence are particularly susceptible of jury determination." Taylor v. Bair, 5 Cir., 1969, 414 F.2d 815; Anderson v. Eagle, 5 Cir., 1970, 423 F.2d 81; Morvant v. Lumbermen's Mutual Casualty Company, 5 Cir., 1970, 429 F.2d 495.

### How It All Happened

On the fateful night of the collision both tractor-trailer rigs involved were proceeding in a northerly direction on Interstate Highway 55 near Hammond, Louisiana. The lead vehicle, driven by Simmons, was carrying a load of building materials weighing in excess of 43,000 pounds. Simmons, admittedly aware of another vehicle behind him, testified that he was driving up the interstate at about 45 or 50 miles per hour when he saw some lights over to the right side of the road appearing as if there had been an accident.[10] He said he immediately

9. Louviere v. Southwestern Traction and Power Company, 1917, 142 La. 590, 77 So. 293.

10. Earlier that same day, another truck had overturned on a feeder road at a point to the right of and adjacent to the point at which the collision herein occurred. Workmen had set up lights off the right side of I–55 and were engaged in reloading the trailer.

pulled out a switch to activate blinking warning lights on the front and rear of his truck and pulled down the hand brake valve to start slowing down. His testimony was that he had slowed to 30 miles per hour when the collision occurred.

King, his vehicle carrying a load of sugar weighing in excess of 45,000 pounds, had been following Simmons for six or seven miles prior to the collision. According to King's testimony, upon reaching a flat, fairly straight section of the four lane highway, he began trying to pick up speed to pass Simmons' truck. He testified that he glanced in his rearview mirror but observed a car approaching to pass him in the left lane such that he was unable to enter the left lane to pass Simmons. At that point in time it was too late to avoid rear-ending Simmons. The collision knocked the building materials forward, crushing forward the cab of Simmons' truck and thereby smashing him between the steering wheel and the cab.

### King's Wrong Flagrant

Except for the claim of Simmons' contributory negligence, King neither does nor can offer any explanation for his own conduct. The collision was the result (in part at least) of his flagrant fault.

■ Of course King began with the heavy burden from Louisiana substantive law which imposes a presumption of negligence upon the driver of the following vehicle in a rear-end collision who bears the burden of exculpating himself from this inference of negligence. Groom v. T. E. Mercer Trucking Co., La.App., 1971, 253 So.2d 586; Barnes v. Toye Brothers Yellow Cab Company, La.App., 4 Cir., 1967, 204 So.2d 83; Strother v. State Farm Mutual Automobile Insurance Company, La.App., 1970, 238 So.2d 774; Prudhomme v. Dore, La.App., 223 So.2d 474; Porter v. Barron, La.App., 185 So.2d 304; Dominique v. Insurance Company of North America, La.App., 195 So.2d 312.

■ King, instead of helping himself, only made matters worse. Confronted with his own testimony from a previous trial involving the property damage of the Frierson (Simmons) truck, King did not disavow that he had expressly acknowledged that because of his inattentiveness he was following too closely.[11]

The Judge was clearly right in giving a peremptory instruction as to negligence against King. With respect to it the only question remaining was whether such negligence was to be visited upon Ace, Dubose, or both.

### Simmons' Negligence

■ But it stands differently as to contributory negligence of Simmons even though the charge is thin and undoubtedly the jury would have held in

11. In the previous trial involving the property damage of the Frierson truck, on cross-examination King testified:
"Q So what you're saying is that you glanced in the mirror and you looked back around and you were right on top of the Frierson truck?
A Too close to stop."
\* \* \* \* \*
Q And you knew the Frierson truck was some 300 feet in front of you at that point, didn't you?
A I did.
Q And you looked away two seconds and when you looked back around you were too close to stop, is that right?
A That's right."
In the trial below King testified that, upon realizing that he couldn't pass, he backed off three to four hundred feet and tried to hold his distance. Here, according to his testimony King had momentarily abandoned his intention to pass and was simply following Simmons' vehicle at between 300 and 400 feet. In doing this, King violated Louisiana Statutes Annotated, R.S. 32:81, which prohibits a motor truck from following within four hundred feet of another motor truck, except when overtaking another vehicle to pass.

Without putting it on statutory negligence per se since the statute has a built-in escape for trucks engaged in passing another, LSA R.S. 32:81, in prohibiting a truck to follow closer than 400 feet, reflects a state policy bearing on general prudence.

his favor.[12]  All three Defendants asserted that Simmons was contributorily negligent in operating his vehicle without proper warning lights and in stopping his vehicle suddenly without warning (see note 6 and 8, supra).  The only evidence adduced at the trial on the question of warning lights was the testimony of King himself that there was an absence of warning that Simmons' vehicle was slowing down.  King admitted that he had been following Simmons for six or seven miles and was therefore aware of his presence ahead, but Simmons also admitted being aware of King's presence behind.  Besides the testimony of King there was likewise little evidence adduced by the Defendants on the question of whether Simmons stopped suddenly.  According to Simmons' version, he had begun slowing down upon seeing what appeared to be another accident ahead.  He testified that he decelerated from 50 miles per hour to 30 miles per hour.  A witness to the accident, Mr. Leonard Spinks, testified that Simmons' deceleration was gradual rather than sudden but that Simmons did slow to 20 or 25 miles per hour.  Spinks also testified that King did not slow down before hitting Simmons.

But probatively weak as it was in the face of strong testimony concerning lights, and undermined further by inconsistencies in King's prior statements (see e.g. note 11, supra), the question remained whether in the critical moments Simmons had timely activated warning lights.  And wrapped up in this was the suddenness of the deceleration.

Evaluating this was a typical jury function.  Consequently the verdict for Simmons based on the erroneous peremptory instruction cannot stand.

### Laying Off King's Fault

The Judge below instructed the jury to find against, in addition to King, at least one of the other Defendants on the issue of negligence.  He then submitted to the jury the question of which, if not both, of the other party-Defendants, Ace or Dubose, was vicariously liable for the negligent acts of King.  The jury chose Ace, thereby exonerating Dubose.  We think it was incorrect for this issue to have been submitted to the jury in the manner done.

### Ace-King-Dubose

Briefly stated the relationship between Ace and Dubose arose in the following manner.  King, driving for Ace, an ICC certificated carrier, left Memphis, Tennessee on the day prior to the collision with a load bound for Baton Rouge, Louisiana.  After delivering his loaded trailer to the Esso Terminal in Baton Rouge he picked up an empty trailer.  The general manager in Memphis directed him to report with tractor and trailer to Dubose, an ICC carrier certificated to transport sugar, in Denham Springs, Louisiana because Dubose wanted to lease two rigs to haul sugar.  Upon King's arrival at Dubose, a lease was prepared [13] under which the tractor-trailer and driver were leased to Dubose to transport a load of sugar from Reserve, Louisiana, to Memphis Tennessee.  King, as instructed, signed this lease on

12.  Once again we see the utility of special interrogatories with a general charge under F.R.Civ.P. 49(a).  See, Brown, Federal Special Verdicts: The Doubt Eliminator, 1968, 38 F.R.D. 199; Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84, 93 n. 31; Horne v. Georgia Southern and Railway Co., 5 Cir., 1970, 421 F.2d 975, 980 (Brown, C. J., concurring); In The Matter of: Double D Dredging Co., 5 Cir., 1972, 467 F.2d 468, 469 n. 3; Wolfe v. Virusky, 5 Cir., 1972, 470 F.2d 831 at 837 (Brown C. J., concurring).  Not only would this likely

have eliminated a retrial of this issue but those on the status and responsibility of Ace, Dubose, or both.

13.  As required by 49 C.F.R. § 1057.4(a)(4) paragraph 5 of the lease provided:
"It is understood that the leased equipment under this agreement is in the exclusive possession, control and use of the authorized carrier Lessee and that the Lessee assumes full responsibility in respect to the equipment it is operating, to the public, the shippers and the Interstate Commerce Commission."

behalf of Ace.[14] Dubose prepared door placard printed "Dubose Trucking Company" with Dubose's ICC authority number and placed them over the Ace identification on the truck (see note 15, infra). The tractor-trailer rig was also inspected by an agent of Dubose (see note 15, infra). King then proceeded to Reserve, Louisiana, picked up a full load of sugar and left about 8:30 p.m. for Memphis. It was about an hour later that the accident occurred.

### ICC, Not Louisiana, Controls

Ace contends that the lease which was effective at the time of the accident, one required by ICC regulations,[15] required

14. It was discovered that Dubose or its authorized agent had failed to actually sign the lease. It appears from the testimony at trial that this was due to simple inadvertence. Since the lease terms are mandated by both statute and regulations and governed the relationship of the parties, the failure of the lessee to sign is of no consequence now or on remand.

15. The regulation which Ace contends is applicable to the lease between it and Dubose is contained in 49 C.F.R. § 1057.4 which provides as follows:

"§ 1057.4 *Augmenting equipment.*

"Other than equipment exchanged between motor common carriers in interchange service as defined in § 1057.5, authorized carriers may perform authorized transportation in or with equipment which they do not own only under the following conditions:

"(a) *Contract requirements.* The contract, lease, or other arrangement for the use of such equipment:

"(1) *Parties.* Shall be made between the authorized carrier and the owner of the equipment.

"(2) *Written contract required.* Shall be in writing and signed by the parties thereto, or their regular employees or agents duly authorized to act for them in the execution of contracts, leases, or other arrangements.

"(3) *Minimum duration of 30 days when operated by lessor.* Shall specify the period for which it applies, which shall be not less then 30 days when the equipment is to be operated for the authorized carrier by the owner or employee of the owner; excepting:

* * * * *

"(b) Where the motor vehicle so to be used is one which has completed a movement covered by section 203(b)(6) of the Act and such motor vehicle is next to be used by the motor carrier in a loaded movement in any direction, and/or in one or more of a series of movements, loaded or empty, in the general direction of the general area in which such motor vehicle is based; and

"(c) *Provided,* In either instance that

prior to the execution of the lease, the authorized carrier receives and retains a statement signed by the owner of the equipment, or someone duly authorized to sign for the owner, authorizing the driver to lease the equipment for the movement or movements contemplated by the lease, certifying that the equipment so leased meets the qualifications enumerated so leased meets the qualifications enumerated in (a) or (b) of this subsection, and specifying the origin, destination, and the time of the beginning and ending of the last movement which brought the equipment within the purview of this subsection.

* * * , * *

"(4) *Exclusive possession and responsibilities.* Shall provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement except:

* * * * *

"(7) *Copies of lease and their distribution copy to be carried on vehicle.* Shall be executed in triplicate; the original shall be retained by the authorized carrier in whose service the equipment is to be operated, one copy shall be retained by the owner of the equipment, one copy shall be carried on the equipment specified therein during the entire period of the contract, lease, or other arrangement, unless a certificate as provided in paragraph (d)(2) of this section is carried in lieu thereof.

* * * * *

"(c) *Safety inspection of equipment by the authorized carrier.* It shall be the duty of the authorized carrier, before taking possession of equipment, to inspect the same or to have the same inspected by a peson who is competent and qualified to make such inspection and has been duly authorized by such carrier to make such inspection as a representative of the carrier, in order to insure that the said equipment complies with the Motor Carrier Safety Regulations of the Federal Highway Administration

Dubose to assume full and complete liability and responsibility for the actions and negligence of King while he was operating the vehicle under Dubose's certificate of authority.[16] Ace contends that, if King was negligent, then the trial court erred in not appropriately instructing the jury that Dubose was liable as a matter of law for the acts of King.

■ Dubose, on the other hand, contends that 49 C.F.R. § 1057.4 (see note 15, *supra*) is inapplicable to a situation, similar to the present one, where both carriers are certificated motor common carriers.[17] He submits that the regulation applicable here is 49 C.F.R. § 1057.-5 [18] (see note 20, *infra*) which governs the interchange [19] of equipment between motor common carriers.[20]

of the Department of Transportation. The person making the inspection shall certify the results thereof on a report in the form hereinafter set forth, which report shall be retained and preserved by the authorized carrier . . . .

"(d) *Identification of equipment as that of the authorized carrier.* The authorized carrier acquiring the use of equipment under this rule shall properly and correctly identify such equipment during the period of the lease, contract, or other arrangement in accordance with the Commission's requirements in Part 1058 of this chapter (Identification of Vehicles). ·If a removable device is used to identify the acquiring authorized carrier as the operating carrier, such device shall be on durable material such as wood, plastic, or metal, and bear a serial number in the acquiring authorized carrier's own series so as to keep proper record of each of the identification devices in use.

"(1) *Identification to be removed when lease terminated.* The authorized carrier operating equipment under this part shall remove any legend, showing it as the operating carrier, displayed on such equipment, and shall remove any removable device showing it as the operating carrier, before relinquishing possession of the equipment.

\* \* \* \* \*

16. While Ace and Dubose were both certificated common carriers engaged in interstate commerce and consequently both were under the control and regulation of ICC, Ace was an irregular-route common carrier holding authority from the ICC to transport certain commodities of which sugar was not one. Dubose on the other hand had ICC authority to transport sugar. In effect, the lease entered into between Ace and Dubose allowed the transportation of a load of sugar utilizing Dubose's certificate.

17. Dubose argues that the opening sentence of § 1057.4—"*Other than equipment exchanged between motor common carriers in interchange service as defined*

*in* § *1057.5*" (emphasis ours)—is exclusive of situations where lessor and lessee are both certificated common carriers.

18. The lease actually signed for Ace by King did in fact specify that it was "for interchange of Motor Vehicle Equipment." But as with the failure of Dubose to sign, see note 14, *supra*, the evidence requires the conclusion that the parties could only have intended to prescribe a "one-way trip lease".

19. Interchange of equipment is defined in 49 C.F.R. § 1057.2(c) as follows:

(c) *Interchange of equipment.* The physical exchange of equipment between motor common carriers or the receipt by one such carrier of equipment from another such carrier, in furtherance of a through movement of traffic, at a point or points which such carriers are authorized to serve.

20. 49 C.F.R. § 1057.5 provides:

§ 1057.5 Interchange of equipment.

Authorized common carriers may by contract, lease, or other arrangement, interchange any equipment defined in § 1057.2 with one or more other such common carriers, or one of such carriers may receive from another such carrier any of such equipment, in connection with any through movement of traffic, under the following conditions:

(a) *Interchange agreement to be specific.* The contract, lease, or other arrangement providing for interchange shall specifically describe the equipment to be interchanged; the specific points of interchange; the use to be made of the equipment; and the consideration for such use; and shall be signed by the parties to the contract, lease, or other arrangement, or their *regular employees* or agents duly authorized to act for them, in the execution of such contracts, leases, or other arrangements.

(b) *Operating authority of carriers participating in interchange.* The certificates of public convenience and necessity held by the carriers participating in the interchange arrangement must authorize the transportation of the com-

■ We flatly reject Dubose's contention that the lease of equipment in question constituted an "interchange". In motor carrier parlance an "interchange" of equipment is a term of art. It is a form of "interlining" whereby a carrier whose certificated routes do not extend to the through destination permits the on-carrier to use the initiating carrier's equipment to avoid costly useless unloading/reloading costs, and the like shipment to another carrier for delivery. Gilbertville Trucking v. United States, 1962, 371 U.S. 115, 83 S.Ct. 217, 9 L. Ed.2d 177. Even more important no "interchange" was or could have been involved here since Ace had no certificate to transport sugar. The transportation of sugar had to be that of Dubose alone. See, Agricultural Transportation Assoc. of Texas v. King, 5 Cir., 1965, 349 F.2d 873 at 880–81 and notes 23, 24; Thompson v. United States, 1944, 321 U.S. 19, 64 S.Ct. 392, 88 L.Ed. 513; United States v. Rosenblum Truck Lines, 1941, 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed. 671.

■ The legislative-administrative travail behind the ICC regulations on trip leases reflects the importance attached by the Congress and ICC to the

modities proposed to be transported in the through movement and service from and to the point where the physical interchange occurs.

(c) *Through bills of lading required.* The traffic transported in interchange service must move on through bills of lading issued by the originating carrier, and the rates charged and revenues collected must be accounted for in the same manner as if there had been no interchange of equipment. Charges for the use of the equipment shall be kept separate · and distinct from divisions of the joint rates or the proportions thereof accruing to the carriers by the application of local or proportional rates.

(d) *Safety inspection of equipment.* It shall be the duty of the carrier acquiring the use of equipment in interchange to inspect such equipment, or to have it inspected in the manner provided in § 1057.4(c). Equipment which does not meet the requirements of that paragraph shall not be operated in the respective services of the interchange carriers until the defects have been corrected. Where carriers interchanging equipment for a through movement of traffic are commonly controlled and jointly maintain and administer a uniform safety program, no such inspection at the point of interchange is required; *Provided,* That the equipment interchanged has been so inspected immediately prior to the start of the movement in which the interchange occurs and found to meet the requirements of § 1057.4(c).

(e) *Identification of equipment as that of the operating carrier.* Authorized carriers operating power units in interchange service shall identify such equipment in accordance with the Commission's requirements in Part 1058 of this chapter (Identification of Motor Carrier Vehicles). Any removable device used to identify the operating carrier shall be on durable materials such as wood, plastic, or metal, and shall bear a serial number in the operating carrier's own series and such carrier shall keep a proper record of each identification device in use. The authorized carrier operating equipment under this part shall remove any legend, showing it as the operating carrier, displayed on such equipment, and shall remove any removable device showing it as the operating carrier, before relinquishing possession of the equipment. Authorized carriers operating equipment in interchange service under this section shall carry with each vehicle so operated, except trailers and semitrailers, a copy of the contract, or other arrangement, while the equipment is being operated in the interchange service, unless a statement certifying that the equipment is ·being operated by it and identifying the equipment by company or State registration number, showing the specific point of interchange, the date and time of the assumption of responsibility for the equipment, and the use to be made of the equipment, is carried in the vehicle while it is operated in interchange service. Such statement shall be signed by the parties to the contract or other arrangement or their employees or agent.

(f) *Connecting carriers considered as owner.* An authorized carrier receiving equipment in connection with a through movement shall be considered the owner of the equipment for the purpose of leasing the equipment to other authorized carriers in furtherance of the movement to destination or the return of the equipment after the movement is completed.

economic necessity for such short term leases and why it is critical that ICC regulations and the leases mandated by them have supreme, controlling significance. They grew out of the decade long ex parte proceeding No. MC–43 pursuant to the authority contained in Section 204, 49 Stat. 546, as amended, 49 U.S.C.A. 304.[21] The arduous road has been often traced. Agricultural Transportation Assoc. of Texas v. King, 5 Cir., 1965, 349 F.2d 873. See, Agricultural Transportation Assoc. of Texas v. King, *supra* at 881, 882 and many others.[22] Many factors were behind this legislative-administrative determination. Many were economic to avoid costly dead hauls. But many were to correct abuses

21. Subsection (e) and (f) of 49 U.S.C.A. 304 provides:

Regulations governing use of vehicles owned by others

(e) Subject to the provisions of subsection (f) of this section, the Commission is authorized to prescribe, with respect to the use by motor carriers (under leases, contracts, or other arrangements) of motor vehicles not owned by them, in the furnishing of transportation of property—

(1) regulations requiring that any such lease, contract, or other arrangement shall be in writing and be signed by the parties thereto, shall specify the period during which it is to be in effect, and shall specify the compensation to be paid by the motor carrier, and requiring that during the entire period of any such lease, contract, or other arrangement a copy thereof shall be carried in each motor vehicle covered thereby; and

(2) such other regulations as may be reasonably necessary in order to assure that while motor vehicles are being so used the motor carriers will have full direction and control of such vehicles and will be fully responsible for the operation thereof in accordance with applicable law and regulations, as if they were the owners of such vehicles, including the requirements prescribed by or under the provisions of this chapter with respect to safety of operation and equipment and inspection thereof, which requirements may include but shall not be limited to promulgation of regulations requiring liability and cargo insurance covering all such equipment.

Exceptions to regulations for use of vehicles owned by others

(f) Nothing in this chapter shall be construed to authorize the Commission to regulate the duration of any such lease, contract, or other arrangement for the use of any motor vehicle, with driver, or the amount of compensation to be paid for such use—

(1) where the motor vehicle so to be used is that of a farmer or of a cooperative association or a federation of cooperative associations, as specified in section 303(b)(4a) or (5) of this title, or is that of a private carrier of property by motor vehicle as defined in section 303(a)(17) of this title and is used regularly in the transportation of property of a character embraced within section 303(b)(6) of this title or perishable products manufactured from perishable property of a character embraced within section 303(b)(6), of this title, and such motor vehicle is to be used by the motor carrier in a single movement or in one or more of a series of movements, loaded or empty, in the general direction of the general area in which such motor vehicle is based; or

(2) where the motor vehicle so to be used is one which has completed a movement covered by section 303(b)(6) of this title and such motor vehicle is next to be used by the motor carrier in a loaded movement in any direction, and/or in one or more of a series of movements, loaded or empty, in the general direction of the general area in which such motor vehicle is based.

Feb. 4, 1887, c. 104, Pt. II, § 204, as added Aug. 9, 1935, c. 498, 49 Stat. 546, and amended June 29, 1938, c. 811, § 4, 52 Stat. 1237; Sept. 18, 1940, c. 722, Title I, §§ 19, 20(a, b), 54 Stat. 921, 922; Mar. 27, 1942, 3 p. m., E.W.T., c. 199, Title I, § 101, 56 Stat. 176; Aug. 3, 1956, c. 905, § 2, 70 Stat. 958; Aug. 3, 1956, c. 928, 70 Stat. 983.

22. *See*, American Trucking Associations, Inc. v. United States, 1953, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337; Mellon National Bank and Trust Co. v. Sophie Lines, Inc., 3 Cir., 1961, 289 F.2d 473, Cosmopolitan Mutual Insurance Company v. White, D.C.Del., 1972, 336 F.Supp. 92; Christian v. United States, D.C.Md., 1957, 152 F.Supp. 561; Cox v. Bond Transportation, Inc., N.J.Sup., 1969, 53 N.J. 186, 249 A.2d 579; Duke v. Thomas, Mo.App., 1961, 343 S.W.2d 656.

that had arisen under often fly-by-night arrangements with consequent damage to the development and maintenance of a sound transportation system and to the public interest from a helter-skelter operation of thousands of unregulated vehicles on the highways as a menace to safety.

■ One way to assure responsibility was to impose on the certificated carrier the full responsibility for the entire operation of temporarily leased equipment, whether owner-driver, or otherwise. The regulation (note 15, *supra*) and the mandated lease provision are valid.

■ We agree with the United States District Court for the District of Delaware where they wrote " * * * the ICC carrier's liability for equipment and drivers covered by leasing arrangements is not governed by the traditional common law doctrine of master-servant relationships and respondeat superior." Cosmopolitan Mutual Ins. Co. v. White, *supra* at 99. And more recently the Seventh Circuit in Alford v. Major, 7 Cir., 1972, 470 F.2d 132.

■ Here the lease specifically stated that Dubose as lessee assumed "full responsibility * * * to the public" (see note 13, *supra*) as required by § 1057.4 (see note 15, *supra*). Requisite placards and an inspection were also provided by Dubose as required by § 1057.4 (see note 15, *supra*). The deliberate fulfillment of these statutory prerequisites by the parties must be viewed as giving rise to a statutory relationship, since these regulations have the force and effect of law, Cox v. Bond, *supra*, 249 A.2d at 586. Since under the lease Dubose assumed exclusive possession, control, and use of the vehicle and responsibility to the public then King became his statutory employee, and as such Dubose was vicariously liable as a matter of law for the negligence of King.

In every conceivable way Ace tried to get the Court to instruct that as a matter of ICC law Dubose was responsible for King's actions. Not only did the Judge decline to so instruct but he openly disparaged the defense. Ace made its position clearly known. The Court erred in rejecting it and Ace has full right to have this error reviewed. *Cf.* Williams v. Slade, 5 Cir., 1970, 431 F.2d 605.

### Ace Not Home Free

■ Although Dubose is liable for King's acts as a matter of law, Ace could still be likewise liable under applicable common (civil) Louisiana standards of control. This is not as incongruous as might be supposed. ICC can mandate a positive legal responsibility which we uphold in the only way it would be meaningful—to give protection to the injured member of the public At the same time Ace has, or may have, a practical control over King of a kind which would not allow it to obtain an automatic insulation from liability from the mere terms of a lease between two parties.

### What Comes Next?

Since the damages allowed may well have been affected by the erroneous instruction on contributory negligence, and Ace is entitled to its instruction as to Dubose's liability the case calls, we think, for an entire retrial,[23] as unfortunate and as unnecessary as that might have been (see note 12, *supra*).

Reversed and remanded.

---

23. Were we not reversing and remanding because of the erroneous instruction below on the issue of contributory negligence, we would have to remand anyway for the Court to determine whether in its discretion it would nevertheless grant a new trial, United States v. 1160.96 Acres of Land in Holmes County, Mississippi, 5 Cir., 1970, 432 F.2d 910. Since under Gorsalitz v. Olin Mathieson Chemical Corporation, 5 Cir., 1970, 429 F.2d 1033 we hold that the remittitur was erroneous.

Also, we decline at this time to express an opinion as to the District Court's disallowance of some items of cross-Appellant's bill of costs.