Arnold N. BILLINGS

v.

RALPH E. CURTIS & SON, INC., et al.

Supreme Judicial Court of Maine.

April 19, 1979.

Marshall T. Cary (orally), Bangor, for plaintiff.

Mitchell, Ballou & Keith by Peter M. Weatherbee (orally), Bangor, Bruce S. Billings, Limestone, for defendants.

Before POMEROY, ARCHIBALD, WERNICK, GODFREY and NICHOLS, JJ.

ARCHIBALD, Justice.

Arnold N. Billings appeals from the pro forma affirmance by the Superior Court of the finding of the Workers' Compensation Commission (WCC) that he was not an employee of Ralph E. Curtis & Son, Inc. (Curtis). When injured the appellant was driving a tractor-trailer leased to Curtis by one Leo Cote. Appellant argues that, as a matter of law, Curtis was his employer at the time because of certain regulations promulgated by the Interstate Commerce Commission (ICC).

We disagree and deny the appeal.

### FACTS

In order to be able to haul lumber in interstate commerce, Leo Cote leased his truck-tractor and a trailer to Curtis, a carrier licensed by the ICC. According to the provisions of the lease,[1] Cote as the lessor was responsible for the maintenance and insurance of leased equipment and was obligated to "pay [his] driver's salary, compensation coverage, and all taxes, state or federal, based on payroll" and "all fines due to overload, overlength, speeding or other wilful acts and negligence of operation of the leased vehicle." Cote and Curtis had further agreed that fuel charges and other expenses incurred on each trip were payable by Cote. According to the lease agreement, Cote received ninety percent of the revenue for each load. For its ten percent Curtis acted merely as the broker, receiving notice of a load of lumber to be shipped and arranging for a truck owned by or leased to itself to transport the load.

---

1.  Pertinent portions of the lease provided:

> 1. The Lessor agrees to deliver to the Lessee the above equipment in good running order and condition, maintain the same, at his expense, in good working condition, and in accordance with safety requirements of the Interstate Commerce Commission and to pay all other expense. . . .
>
> . . . . .
>
> 3. The Lessor shall pay driver's salary, compensation coverage, and all taxes, state or federal, based on payroll.
>
> 4. Lessor agrees . . . to pay all fines due to overload, overlength, speeding or *other wilful acts and negligence of operation* of the leased equipment, lack of permits or plates or any other fines assessed against him for any cause, and further agrees that in the event such fines are paid by Lessee, the

> Lessor will reimburse Lessee for such fines so paid.
>
> . . . . .
>
> 7. In all events, Lessor agrees to become fully responsible to Lessee for any and all negligence of himself *or his driver* in the operation of the leased equipment, and to indemnify and save the Lessee harmless from any and all claims, demands, judgment loss, damage and expenses arising from negligent operation of said equipment.
>
> 8. It is understood that the *leased equipment under this agreement is in the possession, control and use of the authorized carrier Lessee and that the Lessee assumes full responsibility* in respect to the equipment it is operating to the public, the shippers, and the INTERSTATE COMMERCE COMMISSION.
>
> . . . (emphasis supplied)

Although he had previously driven his truck personally, in October 1976 Cote hired Billings to drive and fixed his wage rate at ten cents per mile, which was paid out of Cote's income derived from the rental agreement. Billings received his instructions regarding the origin and destination of each load from either Cote or one Maurice Cole, whom Cote paid to receive that information from Curtis and relay it to the driver of the Cote-owned truck. Expense money for each trip was obtained by Billings from Cote at his home.

After delivering the load on his second trip, Billings lost control of the vehicle when it skidded on a snow-covered hill. He was thrown through the truck's windshield and suffered a third degree separation of the achromial clavicular joint and a puncture wound. The dislocation necessitated a surgical procedure and left the employee totally disabled from November 5, 1976, until December 7, 1976.

## BILLINGS' EMPLOYER

The factual findings of the WCC are final unless unsupported by competent evidence and thereby clearly erroneous. *See, e. g., McQuade v. Vahlsing, Inc.*, Me., 377 A.2d 469, 471 (1977); *Cardello v. Mt. Hermon Ski Area, Inc.*, Me., 372 A.2d 579, 580–81 (1977); 39 M.R.S. § 99. Whether the WCC has misapplied the controlling law to these findings, however, is a matter on which this court may properly utilize its own judgment. *See, e. g., Gilbert v. Maheux*, Me., 391 A.2d 1203, 1206 (1978); *Bowen v. Maplewood Packing Co.*, Me., 366 A.2d 1116, 1118 (1976); *Jacobsky v. D'Alfonso & Sons, Inc.*, Me., 358 A.2d 511, 513 (1976).

As the petitioner in the instant case, the employee had the burden of showing by a preponderance of the evidence his entitlement to compensation. *See, e. g., Rugan v. Dole Company*, Me., 396 A.2d 1003 (1979); *Oliver v. Wyandotte Ind. Corporation*, Me., 360 A.2d 144, 149 (1976). Essential to the appellant's claim against Curtis was proof of his status as an employee of Curtis. *See Cardello v. Mt. Hermon Ski Area, Inc.*, Me., 372 A.2d 579, 581 (1977); 39 M.R.S.A. § 51.[2] It was thus incumbent upon Billings to show that his initial employer, Cote, no longer had the right to control the details of his employment and that Curtis, as the corporation he served, had that right. *See Torsey's Case*, 130 Me. 65, 67, 153 A. 807, 808 (1931); *Gagnon's Case*, 128 Me. 155, 158–59, 146 A. 82, 83 (1929); 1B Larson's Workmen's Compensation § 48.10; *see generally Cardello v. Mt. Hermon Ski Area, Inc., supra; Harlow v. Agway, Inc.*, Me., 327 A.2d 856, 859 (1974).

Competent evidence supports the finding of the WCC that Cote retained the right of control over the details of Billings' activities. In designating the loads to be shipped and their destinations, Curtis merely prescribed the ultimate parameters of the employment. No evidence of Curtis' specification of routes to be taken, places to refuel, or times or places for general repair of the truck, however, exists within the record. Nor can one assume that Cote did not have the right to decide that he, rather than the appellant, would drive on a particular trip. Curtis' interest in the activities of Billings was limited to compliance with ICC regulations while achieving the timely and safe arrival of a load at its destination. The manner in which the driver accom-

2. § 51. Entitlement to compensation and services generally

   If an employee who has not given notice of his claim of common law or statutory rights of action, or who has given such notice and has waived the same, as provided in section 28 receives *a personal injury arising out of and in the course of his employment* or is disabled by occupational disease, he shall be paid compensation and furnished medical and other services by the employer who shall have assented to become subject to this Act.

39 M.R.S.A. § 51 (emphasis supplied).
Employee is defined within 39 M.R.S.A. § 2(5) as

   A. 'Employee' shall include . . . counties, cities, towns . . . and *every person in the service of another under any contract of hire, express or implied, oral or written* . . . .

(emphasis supplied).

plished this was not shown to be a matter of concern to Curtis. Cote, however, as the owner of the equipment and the person ultimately responsible for compliance with state and municipal ordinances and regulations, was obviously interested in the details of the truck's day-to-day operation. Although the lease[3] of the truck provided that the licensed carrier had a theoretical right of control, the WCC could find that the actual relationship between the parties did not conform to the contract. *War Emergency Co-Op Association v. Widenhouse,* 169 F.2d 403, 407 (4th Cir. 1948). The WCC's finding that Cote had in fact retained the right of control over his driver is, therefore, supported by the evidence and is not erroneous.

▪ The appellant asserts, however, that irrespective of the actual relationship between the driver, general employer, and special employer, ICC regulations of the trucking industry require a finding that the licensed special employer had exclusive control of Cote's truck and necessarily the driver. In *Weeks v. Kelley,* Me., 377 A.2d 444 (1977), we consider the significance of 49 C.F.R. § 1057, which requires that a licensed carrier be in exclusive control of vehicles leased to it.[4] We stated in *Weeks* with respect to an action for negligence on the theory of *respondeat superior:*

> [L]iability arises by virtue of the ICC regulations, which have the force and effect of law. Given their plain and ordinary meaning, the words utilized in Section 1057.4, obligating the lessee to assume 'complete . . . responsibility in respect [to the leased equipment],' statutorily create a relationship between the lessee carrier and the operator of the leased equipment comparable to that of employer-employee . . . .

*Weeks v. Kelley, supra* at 447. In *Weeks,* however, the finding of a master-servant relationship as a matter of law without reliance upon traditional concepts of employer-employee relationships advanced a recognized federal interest

> to correct abuses that had arisen under often fly-by-night arrangements with consequent damage to the development and maintenance of a sound transportation system and to the public interest from a helter-skelter operation of thousands of unregulated vehicles on the highways as a menace to safety.

*Weeks v. Kelley, supra* at 447, *quoting Simmons v. King,* 478 F.2d 857, 866–67 (5th Cir. 1973).

In this instance it is difficult to imagine a federal interest in the determination of a master-servant relationship for the purposes of workmen's compensation. Nor has the appellant been forthcoming with plausible federal policies at stake.

Other courts have reached similar conclusions with respect to the significance of ICC regulations in the determination of employment status for purposes of workmen's compensation. *Harold M. Kelly, Inc. v. Walton,* 6 Pa.Cmwlth. 236, 293 A.2d 627, 630 (1972); *Tretter v. Dart Transit Co.,* 271 Minn. 131, 137, 135 N.W.2d 484, 488 (1965); *Beany v. Paul Arpin Van Lines Co.,* 98 R.I. 193, 195, 200 A.2d 592, 594 (1964); *Gibson v. Moore Motor Freight Lines,* 246 Minn. 359, 363, 75 N.W.2d 212, 216 (1956).

Appellant places much reliance upon the holding in *DeBerry v. Coker Freight Lines,* 234 S.C. 304, 108 S.E.2d 114 (1959), in which the South Carolina Supreme Court gave great weight to the ICC regulation requiring the licensed lessee to exercise exclusive control of leased equipment. In both its facts and procedural posture, however, *De-*

---

3. *See n.1, supra.*

4. 14 C.F.R. § 1057.4 provides in pertinent part:
    Augmenting equipment.
    Other than equipment exchanged between motor common carriers in interchange service as defined in § 1057.5, authorized carriers may perform authorized transportation in or with equipment which they do not own only under the following conditions:

(a) *Contract requirements.* The contract, lease, or other arrangements for the use of such equipment:

    .    .    .    .    .

(4) *Exclusive possession and responsibilities.* Shall provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement . . . .

*Berry* is distinguishable. The trial judge sustained the findings of the South Carolina Industrial Commission, which had concluded that the licensed carrier was the employer of the injured driver. The question on appeal, therefore, was whether sufficient testimony warranted such a conclusion. In contrast, the matter at hand is whether sufficient evidence warrants the finding that the lessor and not the licensed carrier was the injured driver's employer. Unlike the instant case, in *DeBerry* "the owner of the truck had nothing to do with when or where [the licensed carrier] sent the respondent." The driver received his instructions regarding each shipment from the manager of the licensed carrier and realized he was subject to discharge if he deviated from those instructions.

### MOTION TO PROCEED EX PARTE

The WCC received the appellant's Petition for Award of Compensation on September 9, 1977. Appellant asserts that notice of the pendency of the proceedings was mailed to Curtis and Cote on September 14, 1977. Curtis did not file an answer until October 5, 1977, and Cote's answer was not filed until a day later. On October 3, 1977, appellant moved to proceed with the petition ex parte. The WCC did not act upon the motion and allowed participation by both parties in opposition.

39 M.R.S.A. § 97[5] allows the parties interested in opposition *fifteen* days after notice of the filing of the petition in which to file an answer. Failure of such party to file a timely answer results in the hearing proceeding upon the petition. 39 M.R.S.A. § 97. Appellant contends that section 97 mandates that the Commission conduct the hearing ex parte.

For two reasons we consider this issue to be inappropriate for appellate review.

First, no evidence of the date of mailing of the notice to Cole and Curtis exists within the record on appeal. Consequently we have nothing on which to base a finding that the answers were untimely. Second, the Commission failed to act upon the appellant's motion, and the appellant proceeded to introduce evidence regarding the issues of his employment and disability. We therefore consider appellant to have intentionally waived the issue by his failure to press it before the Commissioner in order to obtain a ruling. Cf. *White v. Monmouth Canning Company,* Me., 228 A.2d 795, 801 (1967); *Ross' Case,* 124 Me. 107, 126 A. 484 (1924).

The entry is:

Appeal denied.

Judgment affirmed.

McKUSICK, C. J., and DELAHANTY, J., did not sit.

---

5. § 97. Filing of answers

*Within 15 days after notice of the filing* of such petition all the other parties interested in opposition shall file an answer thereto and furnish a copy thereof for the petitioner, which answer shall state specifically the contentions of the opponents with reference to the claim as disclosed by the petition. . . *If any party opposing such petition does not* *file an answer within the time limited, the hearing shall proceed upon the petition.*

Except that for good cause shown, a single commissioner may permit the late filing of any pleading permissible under this Act. 39 M.R.S.A. § 97 (emphasis supplied) (amended by P.L.1977, ch. 437, § 5). Effective October 24, 1977, section 97 allows 20 days in which to file an answer.