447 So.2d 414 (1984)
HILLDRUP TRANSFER & STORAGE OF NEW SMYRNA BEACH, INC., Appellant,
v.
STATE of Florida, DEPARTMENT OF LABOR AND EMPLOYMENT SECURITY, DIVISION OF EMPLOYMENT, Appellee.
No. 82-1592.
District Court of Appeal of Florida, Fifth District.
March 22, 1984.
*415 Charles M. Rand and Thomas C. Garwood, Jr., of Akerman, Senterfitt & Eidson, Orlando, for appellant.
Geri M. Atkinson-Hazelton, Tallahassee, for amicus curiae Associated Industries of Florida, Inc.
Alex D. Littlefield, Jr., Tallahassee, for appellee.
FRANK D. UPCHURCH, Jr., Judge.
Hilldrup Transfer & Storage of New Smyrna Beach, Inc., appeals from a determination by the State of Florida's Division of Employment Security that two kinds of truck drivers performing work in Hilldrup's interstate moving business are in its employment within the meaning of section 443.036(17), Florida Statutes (1981),[1] and therefore, Hilldrup is subject to the state unemployment tax. If the truck drivers are independent contractors, Hilldrup would not be subject to the tax.
The facts involved here are essentially undisputed. The decision therefore depends upon the legal relationship that the undisputed facts engender. Cantor v. Cochran, 184 So.2d 173 (Fla. 1966), citing Toney Builders, Inc. v. Huddleston, 149 So.2d 38 (Fla. 1963). The question presented on appeal is whether the Division correctly concluded that a master-servant, as *416 opposed to an independent contractor, relationship existed here. We reverse.
Hilldrup is in the moving and storage business. It owns and uses van type trailers to move principally household furnishings. It utilizes its own tractors and drivers (their status is not in question) to move some loads. Other loads, however, are moved via company vans by operators who either own their own tractors or lease them from Hilldrup.[2] Under a written agreement, these contract operators are paid a percentage (fifty-three percent) of the established rate for the particular haul. The operators are not contractually obligated to pack, load, or unload, but are compensated should they elect to do so. The agreement specifically provides that the operators are to be independent contractors and that the company cannot control or endeavor to control the manner, or prescribe the method of doing that portion of the business of the company which has been contracted for, and that the contractor is responsible for results only. The contract can be terminated by either party upon written notice, provided that the operator completes any delivery which had been commenced prior to termination.
The operators are responsible for payment of all expenses connected with the operation and ownership of their tractors, including fuel, insurance,[3] repairs, maintenance, parking, licenses, applicable taxes, and road and bridge tolls. The operators can hire any help they require and are responsible for all wages, employment taxes, and worker's compensation for these helpers. The operators have complete control over the selection, supervision and discharge of these helpers.
Under this arrangement, Hilldrup is able to simplify its operation. Its capital requirement is substantially reduced since acquisition costs of tractors and expenses attendant to their operation are reduced. Control over operation and care of the tractors is transferred to the operators, who have the most to gain by prudent and careful operation. The cost of movement of a load becomes accurately predictable.
On the other hand, the operators receive economic benefits from the arrangement, which is illustrated by the fact that they work an average of four years for Hilldrup. They can increase their profits by prudent operation and maintenance of their tractors. They can work their own hours, select the routes they wish to travel and choose what assignments to accept. They are able to acquire and utilize profitably through care, judgment and their own industry an expensive piece of equipment which may substantially increase their income-producing potential.
The special deputy, citing Cantor, relied upon the factors enunciated in the Restatement (Second) of Agency, § 220 (1958) in finding that these contract-operators are employees. That section of the Restatement provides:
(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, *417 tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relationship of master and servant; and
(j) whether the principal is or is not in business.
The deputy appears to have placed the greatest emphasis on control. He found control on the part of Hilldrup because the operators are obligated to keep the dispatcher informed of their progress and contents of their vehicles, file reports with Hilldrup as requested, wear company uniforms and paint their tractors with Hilldrup's colors and name.
The Division and the deputy have misconstrued the type of control which is specified in the Restatement which states:
(a) The extent of control which, by the agreement, the master may exercise over the details of the work. (emphasis added)
By the agreement here, Hilldrup has no right of control. The contract specifies that:
[I]t is understood and agreed that Company has not the right to, and will not control or endeavor to control the manner, or prescribe the method of doing that portion of the business of the Company which is contracted for herein by Contractor. Contractor will be held responsible for results only... .[4]
Of even more importance, however, is Hilldrup's interest in the end result as opposed to the details of the operator's work. See Cosmo Personnel Agency of Fort Lauderdale, Inc. v. State, 407 So.2d 249 (Fla. 4th DCA 1981); Herbert Hayes Yacht and Ship Sales, Inc. v. Lovell, 406 So.2d 1259 (Fla. 4th DCA 1981).[5] By permitting the operators to set their own work hours and routes, hire and supervise their own helpers and accept or reject work assignments, Hilldrup has indicated a lack of interest in the details of their work.
The facts relied upon by the deputy in finding control are actually of little relevance when compared to the above factors. For instance, the requirement that the operators wear uniforms and paint their tractors with Hilldrup's colors and name is merely designed to assure the carrier's customers that the operators are representatives of Hilldrup. Also, while the operators are requested to notify Hilldrup daily of their whereabouts and contents of their vehicles, this is intended not so much as a control over the operators, but as an aid in utilizing the trucks and trailers efficiently. Finally, the operators are required to submit reports to Hilldrup "as requested." The nature of these reports is not clear but, in any event, such requirement does not constitute control over the means and methods of accomplishing the results sought. See Florida Industrial Comm. v. State, 155 Fla. 772, 21 So.2d 599 (1945).
The special deputy also erroneously concluded that the operators are not in a separate business. It is clear that they are. Each operates an independent business of his own. Each must invest substantial sums in equipment and bear any risk of loss attributable to his operation. *418 The success of an operator depends upon his own skill and business acumen, and not on that of Hilldrup. An operator does have an on-going relationship with Hilldrup but only in the sense that he may do more work for Hilldrup some time in the future. Hilldrup and the operators are separate business entities and each may make a profit or loss irrespective of the others profits or losses. See generally Merchants Home Delivery Service, Inc. v. N.L.R.B., 580 F.2d 966 (9th Cir.1978); SIDA of Hawaii Inc. v. N.L.R.B., 512 F.2d 354 (9th Cir.1975). As stated in United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 1471, 91 L.Ed. 1757 (1947) which is another case involving owner-operator truck drivers:
It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors.
Finally, we find another factor significant which neither the special deputy nor the Division considered. Section 443.131, Florida Statutes (1981), provides that an employer shall pay 2.7% of an employee's wages as contribution for unemployment compensation. The operators punch no time cards and work the times and hours they elect. What would their wage be? Would Hilldrup pay 2.7% of the "employee's" total compensation which includes payment for the use of the truck? Would the amount be figured after deducting fuel, garaging, insurance, maintenance, tolls and other expenses paid by the operator? A large truck represents a substantial investment. Could Hilldrup consider depreciation and interest on any purchase loans in determining wages? Could the Division require Hilldrup to calculate an estimated wage on the same basis as their non-contract drivers? If so, how could it determine hours when the operators are free to work their own hours and choose their travel routes?
The relationship between Hilldrup and its operators has a legitimate business purpose. Compare A Nu Transfer, Inc. v. Dept. of Labor & Employment Security, 427 So.2d 305 (Fla. 3d DCA 1983) with Justice v. Belford Trucking Company, Inc., 272 So.2d 131 (Fla. 1972).[6] It is not simply a subterfuge to avoid the payment of unemployment or other taxes. The Division ignored the intent and relationship established by the agreement. It should have found that the contract operators are independent contractors.
REVERSED.
DAUKSCH, J., concurs.
SHARP, J., dissents with opinion.
SHARP, Judge, dissenting.
The issue in this case is whether or not the agency's determination that the truck drivers are employees is supported by substantial evidence.[1] A substantial number of significant factors in this case, which are supported by the evidence in this record, point towards the agency's conclusion that both kinds of truck drivers are employees rather than independent contractors. Others, it is true, point the other way. But we should give credence to the agency's findings *419 of fact[2] and accept its weighing of the factors in arriving at its conclusions in this case as presumptively correct.[3] We should not, as I think the majority opinion does in this case, reweigh the evidence in support of a contrary finding.
This case involves the status of two kinds of truck drivers who transport house hold goods for Hilldrup in interstate moves: those who own their own power units or tractors, and in some cases, lease trailers from Hilldrup (owner-drivers); and those who lease tractors as well as trailers from Hilldrup (lease-drivers). The Division of Employment Security adopted the special deputy's findings of fact:
The Petitioner is a Florida corporation whose primary business activity is the movement and storage of household goods in both intrastate and interstate traffic. The Petitioner hires three types of drivers to transport the household goods in the course of its regular business. The first type drivers are those paid by the hour and are considered employees by the Petitioner. In addition to the drivers the Petitioner considers employees, the Petitioner also contracts with drivers who own their own tractors and drivers who rent or lease tractors from the Petitioner. The contract between the Petitioner and these drivers is written and entitled "Contractor's Agreement." The contractual relationship and [sic] the Petitioner and the owner/operators provide for the following conditions. The owner/operator is required to devote his tractor exclusively to the service of the Petitioner. The tractor is painted with the Petitioner's colors, insignia, and permit and certificate numbers, at the expense of the Petitioner. If the tractor is removed from service within the first six months of the contract, the owner/operators are required to pay for the painting. The Petitioner supplies to the owner/operator a trailer to be used exclusively in the service of Petitioner. The Petitioner also furnishes moving pads, piano carrier and boards, dollies, and ramps. The owner/operator is required to furnish any additional equipment needed. The owner/operator is also required to furnish his own hand tools. The owner/operator's job responsibilities include the hauling, loading and unloading of household goods. The owner/operator may earn additional compensation by packing and unpacking the household goods. This latter function is performed at the discretion of the owner/operator. The owner/operators have the right to reject offered job assignments without adverse consequences to their continuing relationship with the Petitioner. The owner/operator is required to maintain a valid chauffeur driver's license, which is paid for by the owner/operator. All of the permits, licenses, and certificates for operation of the tractor and trailer in the Petitioner's business, is furnished by the Petitioner. The owner/operators are compensated by the Petitioner on a commission basis. The commission is a fixed percentage of the services performed, as set forth in the "Contractor's Rate Income Schedule." The job cost in most cases is determined by the rates set by the Federal government with whom the Petitioner must file rate tariffs. The Petitioner does not guarantee to meet a minimum amount of compensation. The owner/operators are not required a minimum quota. The owner/operators are required to wear a specified uniform as designated by the Petitioner. The owner/operators are required to furnish, at their own expense, public liability and property damage insurance upon his vehicle. The owner/operators are also required to furnish all maintenance and upkeep of their vehicles including the cost of fuel, oil, tires, lubricants, garaging, and repairs. The Petitioner *420 is responsible for liability insurance that covers damages to the household goods being transported. The owner/operators are responsible for the first $75 in damages to the household goods caused by their negligence. The owner/operators have the right to hire helpers or assistants to aide them in carrying out their job functions. They have the right to hire, fire, and control these helpers and assistants. The owner/operators can also hire other drivers to operate the trucks. However, any co-drivers hired by the owner/operators must be approved by the Petitioner and meet all regulations imposed by the Federal government. The owner/operators are responsible for the compensation of the workers they use. The owner/operators are required to furnish worker's compensation insurance for the individuals which they hire. The owner/operators are also responsible for providing uniforms for these individuals. The owner/operators cannot work for other companies similarly situated as the Petitioner. The owner/operators are required to submit reports to the Petitioner as requested and notify the Petitioner daily of their whereabouts and contents of their vehicles. The owner/operators set their own hours of work within the pick-up and delivery times set forth in the bills of lading. The Petitioner does not deduct social security, withholding, or other taxes from the owner/operator's remuneration. The Petitioner does not provide any hospitalization or medical insurance for the contractors and the owner/operators are not eligible for bonuses, pensions, sick pay, vacation, or other fringe benefits provided by the Petitioner. The contractual relationship between the Petitioner and the owner/operators contemplates a continuing on-going relationship. The owner/operators usually work an average of four years with the Petitioner. The owner/operator may terminate the contract by supplying the Petitioner with 30 days advance written notice. The Petitioner may terminate the contract by written notice to the owner/operator. The Petitioner and owner/operator believe they are creating a principal/independent contractor relationship. The skills required in the occupation are to be a good truck driver, be able to handle the goods being transported, and be able to verbally communicate with customers.
The contractual relationship between the Petitioner and the lease/operators are substantially the same as that between the Petitioner and the owner/operators, except for the following differences. Approximately 12 percent of the lease/operators commissions are retained by the Petitioner for rental of the vehicle. The Petitioner is responsible for repairs, servicing, garaging, etc. of the vehicle rented or leased by the lease/operators.
The determination of whether a certain kind of work relationship is that of employer or independent contractor, particularly in the context of current ways of doing business, is extremely difficult. There are no bright lines to distinguish the two.[4] Each case turns on the weighing of numerous, and always diverse, factors,[5] no one of which is determinative.[6] As a result, other reported cases are of little precedential value. Magarian v. Southern Fruit Distributors, 146 Fla. 773, 1 So.2d 858 (1941).
Many courts, including our Florida state courts, frame their decisions around the considerations set forth in the Restatement (Second) of Agency § 220 (1958).[7] That section of the Restatement provides:
(2) In determining whether one acting for another is a servant or an independent *421 contractor, the following matters of fact, among others, are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relationship of master and servant; and
(j) whether the principal is or is not in business.
In this case, using the Restatement analysis, the agency's determination can be sustained.

(a) Control
The extent to which the employer exercises control over the details of the employee's performance of the work done has often been stressed as the telling distinction between a servant and an independent contractor.[8] If the person performing the work is responsible and held accountable for the end product only, he is most likely an independent contractor. Florida Industrial Commission v. State ex rel. Orange State Oil Company, 155 Fla. 772, 21 So.2d 599 (1945); Cosmo Personnel Agency of Ft. Lauderdale, Inc. v. State, 407 So.2d 249 (Fla. 4th DCA 1981); Jean M. Light Interviewing Services, Inc. v. State, 254 So.2d 411 (Fla. 3d DCA 1971); Farmers & Merchants Bank v. Vocelle, 106 So.2d 92 (Fla. 1st DCA 1958). Although control and right of control over the work done is highly relevant in determining vicarious liability in tort suits, it is less relevant and therefore less determinative in this context, where the statute involved seeks to impose on business or industry some of the costs of unemployment formerly borne by labor alone.[9]
In this case, some factors point in both directions on the issue of control. Tending towards an independent contractor relationship are the special deputy's findings that the drivers may refuse work assignments (although neither witness at the hearing had ever done so); that they could set their own work hours and routes, so long as the load was delivered within the time on the bill of lading; that they could choose to pack and unpack or not; and that they could hire and supervise their own helpers, although any relief driver had to be approved by Hilldrup. However, the Restatement (Second) of Agency recognizes that the expectation or discretion to hire subservants is not necessarily determinative. It is possible to have superior servants, such as ship captains, managers of large businesses, or mine operators, who hire and direct their own assistants, but all are ultimately subject to the employer's (or master's) control.[10]
Other findings relating to control over the work performed support the special deputy's conclusion that the drivers are employees. The drivers make lengthy reports *422 required by law or regulations for Hilldrup and reports to Hilldrup as requested. Drivers must notify Hilldrup daily of their whereabouts and the contents of their vehicles while fulfilling a moving assignment. The drivers are required to wear specified uniforms with Hilldrup's name and colors. Similarly, their tractors and trailers must be painted with Hilldrup's colors and name.[11] The contracts are terminable at any time by Hilldrup, a factor indicating control over the drivers. Justice v. Belford Trucking Company, Inc., 272 So.2d 131 (Fla. 1972). The contracts also provide that the drivers must report an accident to the company within two hours of its occurrence; that they must comply at all times with company policy and rules; and that Hilldrup at all times has "sole direction of the company's services to the public."[12]

(b) Whether the Drivers are Working in a Distinct Occupation or 
Business.
If the drivers were in a separate, distinct business apart from Hilldrup, this factor would strongly suggest they were independent contractors. But if they are not economically viable work units apart from Hilldrup, this factor would weigh towards an employment relationship. See City Cab of Orlando, Inc. v. NLRB, 628 F.2d 261 (D.C. Cir.1980).
The special deputy concluded that the drivers exclusively perform services for Hilldrup, and that they are not in a business distinct from it. They must wear Hilldrup uniforms and advertise its name on their trucks. Hilldrup alone makes all customer contacts. There is no way for the drivers to build up any individual customer goodwill for themselves. The record sustains the special deputy's conclusion that the drivers perform services essentially for Hilldrup solely. The drivers would have no business, customers, or goodwill apart from Hilldrup.
Further, the contracts provide that the drivers cannot work for any carrier other than Hilldrup while under contract with Hilldrup, and that doing so constitutes a breach of the contract. The witnesses testified that this contract provision was orally modified very recently to allow drivers to bring back loads for other carriers once they empty out a load in a distant city. However, they first must check with Hilldrup to see whether it has a carry-back load for them before looking for another assignment, and they cannot accept outgoing assignments in Florida from other carriers. This factor of not being permitted to work for other carriers on the same basis as Hilldrup distinguishes this case from the taxi drivers in SIDA of Hawaii, Inc. v. NLRB, 512 F.2d 354 (9th Cir.1975); the truck drivers in A Nu Transfer, Inc. v. Department of Labor & Employment Security Division of Employment Security, 427 So.2d 305 (Fla. 3d DCA 1983); the orchestra musicians in Florida Gulf Coast Symphony, Inc. v. Department of Labor & Employment Security, 386 So.2d 259 (Fla. 2d DCA 1980); the interviewers in Jean M. Light Interviewing Services, Inc.; and the janitor in Farmers & Merchants Bank.

(c) Concept of the Job Held in the Community
The special deputy made no particular finding on this point. Reported decisions indicate that truck drivers may be employees[13] or they may be independent contractors.[14]

(d) Level of Skill Required
The greater the skill or special knowledge required to perform the work, the more likely the relationship will be found to *423 be one of an independent contractor,[15] although low-skilled jobs may be performed by independent contractors,[16] and highlyskilled jobs may be performed by employees.[17] In this case, the special deputy found that no special skills beyond that of an ordinary truck driver were required to do Hilldrup's work. Hilldrup usually trains the drivers in its packing and local moving operations before entering into contracts with them. Hilldrup also instructs them about the paper work and reports required by its company policy and by the ICC. However, the evidence tends to support the special deputy's conclusion that no special skills are required. Justice.

(e) Who Supplies the Instrumentalities, Equipment, Supplies, for 
the Person doing the Work
If the place of work, the supplies, the equipment, and other necessaries are supplied by the entity for whom the work is being done, this factor indicates an employment rather than an independent contractor relationship. Florida Industrial Commission; Florida Gulf Coast Symphony, Inc. And the greater the investment of the worker in the equipment he uses and owns to do the work, the stronger this factor weighs in the direction of an independent contractor relationship. See NLRB v. Associated Diamond Cabs, 702 F.2d 912 (11th Cir.1983); A. Duie Pyle, Inc.; SIDA of Hawaii, Inc.
In this case, the record shows that the owner-drivers own their own tractors. Both owner-drivers and lease-drivers lease trailers from Hilldrup, although in some cases the owners also own their own trailers. Hilldrup provides basic tools and equipment with its trailers (pads, dollies, ramps, and piano carriers), and usually the drivers supplement these items at their own expense. The owner-drivers have to pay for their own maintenance and fuel for the tractors. Hilldrup pays for the ordinary maintenance and repair and garaging of its leased trailers and tractors, but the lessees have to pay for the fuel. Hilldrup provides the necessary ICC and State of Florida permits, franchise, and certificate of necessity and commission to operate as a carrier for hauling, and it insures the goods moved. The owner-drivers carry their own liability insurance on their tractors, and all drivers procure their own licenses. This mixture of factors does not appear to weigh heavily in either direction.

(f) Continuity of Employment
The longer and more sustained the work relationship, the more this factor points towards an employment relationship. In this case, the special deputy found that the average time a driver works for Hilldrup is four years  a fairly substantial work time average. He further found, based on substantial evidence in the record, that while the drivers are under contract with Hilldrup, they work exclusively for that company and have a continuing, on-going relationship with it.[18] These findings support the conclusion of the special deputy that the drivers are employees.

(g) Method of Payment
Because an independent contractor is paid on a job-by-job basis, compensation by paying a commission indicates an independent contractor relationship and payment by salary indicates an employment relationship. Florida Industrial Commission; Cosmo Personnel Agency of Ft. Lauderdale, Inc.; Restatement (Second) of Agency § 220 comments (1958). However, this factor, like the others, is not conclusive. Magarian; Justice; City Cab Company of Orlando, Inc.
The special deputy found that the drivers are paid on a commission basis. For each assignment they receive a percentage of *424 the total charge to the customer. The owner-drivers are paid a higher rate than the lease-drivers. From this gross sum, the drivers are expected to pay the fuel costs, insurance, their own social security, withholding, medical insurance, the salary and worker's compensation for any hired assistants. Hilldrup offers the drivers no fringe benefits or pension rights. Hilldrup does not deduct social security, withholding or other taxes from the driver's commission payments. The special deputy concluded that this factor weighed in favor of an independent contractor relationship.

(h) Whether the Work is a Part of the Regular Business of the 
Employer
If the work performed in the relationship under consideration is a part of the principle's business, this factor indicates an employment status, even if the work requires a high level of skill to perform it. Cantor; Magarian; Restatement (Second) of Agency § 220 comments (1958). The more vital or essential the work is to the principal's business, the stronger this factor weighs.
The special deputy concluded that the work done by the drivers in this case is an essential part of Hilldrup's business. These drivers perform most of Hilldrup's interstate or long distance hauling. Were it not for their services, Hilldrup would not be in the interstate carrier business.
The special deputy properly weighed this factor as pointing towards an employment relationship. This factor is more relevant than some of the others in the context of carrying out the state's policy of taxing a business to pay (in part) for the risks of unemployment in that business. § 443.031, Fla. Stat. (1981); see Ceradsky v. Mid-America Dairymen, Inc., 583 S.W.2d 193 (Mo. Ct. App. 1979). Fragmentation of functions or departments could lead to a business operating with few employees in an effort to avoid such taxes. See Florida Industrial Commission v. State ex rel. Gulf Oil Corporation, 159 Fla. 535, 32 So.2d 319 (1947).

(i) Express Belief of the Parties as to the Nature of the Work 
Relationship
The understanding or expressed intent of the parties to enter into an independent contractor relationship rather than an employment relationship, or vice versa, is another factor the fact-finder should consider;[19] however, it is not determinative.[20] In this case, the special deputy concluded that these parties intended to enter into an independent contractor relationship. The witnesses' testimony at the hearing and the express language of the contract support this finding. The special deputy weighed this factor as one of the primary factors in this case pointing towards an independent contractor relationship.

(j) Whether the Principal is or is not in Business
As discussed above, Hilldrup purports to be in the interstate carrier business  the very function being performed for it by the truck drivers involved in this case. It is no more independent of the drivers than they are of it as regards the interstate hauling business. This factor weighs heavily towards the agency's conclusion that the drivers are employees.
I would affirm.
NOTES
[1] Section 443.036(17), Florida Statutes (1981), defines "employment" as:

[A]ny service performed by an employee for the person employing him... .;
and an "employee" as:
[A]ny individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee.
None of the special inclusions or exclusions of the statute appear applicable in this case.
[2] While a closer question is presented as to the lease operators, we conclude no distinction is necessary. If the lease were with a third party instead of Hilldrup it would unquestionably be a legitimate arrangement. There was no showing that the arrangement was a subterfuge so we treat the lease-operators and owner-operators as the same.
[3] The company furnishes insurance on its vans and their contents.
[4] In light of this language, it is curious to note the following findings which the special deputy made. First he stated: "Thus, the record clearly reflects that the Petitioner did have sufficient right of control over the drivers to constitute an employer-employee relationship, ..." He later stated: "In resolving such conflicts, the Special Deputy has accepted the written contracts ... as the best evidence of the relationship of the parties."
[5] See also Merchant's Home Delivery Service, Inc. v. N.L.R.B., 580 F.2d 966 (9th Cir.1978) wherein the court found that owner-operator truck drivers were independent contractors and not employees for purposes of the National Labor Relations Act. The court pointed out there is a difference between directing the means and manner of performance of work and exercising an ex post facto right to reprimand when the end result is unsatisfactory.
[6] Indeed, A Nu Transfer is similar to this case and there the Third District found that truck owner-operators were not employees of a freight carrier but rather were independent contractors. The only major difference between the two cases is that in A Nu Transfer, the owner-operators could work for any competitor of the carrier while here the agreement provided they could not. However, Hilldrup's vice-president explained that this restriction existed because of Interstate Commerce Commission rules which required that permit numbers of the carrier appear on its vehicles. If shipments from other carriers were transported, this rule would have been violated. The vice-president testified, without contradiction, that since 1980, this contractual restriction had not been enforced and operators could obtain other loads so long as a ten percent rental charge was paid to Hilldrup for the use of its trailer.
[1] See City Cab Co. of Orlando, Inc. v. NLRB, 628 F.2d 261 (D.C. Cir.1980); Justice v. Belford Trucking Co., Inc., 272 So.2d 131 (Fla. 1972); Farmers & Merchants Bank v. Vocelle, 106 So.2d 92 (Fla. 1st DCA 1958).
[2] § 120.68(10), Fla. Stat. (1981).
[3] See § 120.68(12), Fla. Stat. (1981). Pursuant to section 443.141, Florida Statutes (1981), the Division of Employment Security of the Department of Labor and Employment Security is empowered to decide which persons are employers and therefore liable to pay the tax imposed by Chapter 443.
[4] NLRB v. A. Duie Pyle, Inc., 606 F.2d 379 (3d Cir.1979), Higginbotham, J., dissenting.
[5] City Cab Co. of Orlando, Inc.
[6] See NLRB v. Associated Diamond Cabs, 702 F.2d 912 (11th Cir.1983); Cantor v. Cochran, 184 So.2d 173 (Fla. 1966); Magarian v. Southern Fruit Distributors, 146 Fla. 773, 1 So.2d 858 (1941).
[7] See, e.g., Cantor; Ceradsky v. Mid-America Dairymen, Inc., 583 S.W.2d 193 (Mo. Ct. App. 1979).
[8] United States Tel. Co. v. State Dep't of Labor & Employment Sec., 410 So.2d 1002 (Fla. 3d DCA 1982); Herbert Hayes Yacht & Ship Sales, Inc. v. Lovell, 406 So.2d 1259 (Fla. 4th DCA 1981); Collins v. Federated Mut. Implement & Hardware Ins. Co., 247 So.2d 461 (Fla. 4th DCA 1971).
[9] See Ceradsky.
[10] Restatement (Second) of Agency, §§ 220, 512 comments (1958).
[11] These factors distinguish this case from A. Duie Pyle, Inc., which otherwise reaches an opposite conclusion on similar facts.
[12] Cf. United States Tel. Co. and Cosmo Personnel Agency of Ft. Lauderdale, Inc. v. State, 407 So.2d 249 (Fla. 4th DCA 1981).
[13] Justice; Collins.
[14] See A. Duie Pyle, Inc.; A Nu Transfer, Inc. v. Department of Labor & Employment Sec. Div. of Employment Sec., 427 So.2d 305 (Fla. 3d DCA 1983).
[15] Florida Gulf Coast Symphony v. Department of Labor & Employment Sec., 386 So.2d 259 (Fla. 2d DCA 1980); Restatement (Second) of Agency § 220 comments (1958).
[16] Farmers & Merchants Bank.
[17] Ft. Lauderdale Symphony Orchestra Ass'n, Inc. v. State of Florida, Dep't of Labor & Employment Sec. Div. of Sec., 405 So.2d 1365 (Fla. 4th DCA 1981).
[18] Cf. Jean M. Light Interviewing Services, Inc. v. State, 254 So.2d 411 (Fla. 3d DCA 1971).
[19] See A. Duie Pyle, Inc.
[20] City Cab Co. of Orlando, Inc.; Justice; Cantor.