**William L. JUDY, Plaintiff–Appellant, Cross–Appellee,**

**Joyce Judy, Plaintiff,**

v.

**TRI–STATE MOTOR TRANSIT COMPANY, a Delaware Corporation, Defendant–Appellee, Cross–Appellant.**

**No. 86–3816.**

United States Court of Appeals, Eleventh Circuit.

May 16, 1988.

Roy B. Dalton, Jr., Stephan W. Carter, Dalton & Provencher, John A. Reed, Orlando, Fla., for plaintiff-appellant, cross-appellee.

G. Yates Rumbley, Orlando, Fla., for defendant-appellee, cross-appellant.

Before TJOFLAT and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Following a jury verdict for plaintiff William L. Judy, the district court granted defendant Tri–State Motor Transit Company's motion for judgment notwithstanding the verdict. Judy appeals, alleging that the jury's verdict should be reinstated. Tri–State Motor Transit Company ("Tri–State") cross-appeals, contending that if the grant of judgment notwithstanding the verdict was erroneous, the district court should have granted defendant's alternative motion for a new trial. For the reasons set forth below, we affirm the judgment of the district court.

I.

Judy, a Florida resident, visited Tri–State's terminal in Altamonte Springs, Florida, in response to a newspaper advertisement for truck drivers. After Judy completed an application for employment, Tri–State directed him to attend its four-day driver's school, undergo a physical examination, and take a written examination and a driving test. Several days later Judy was told that he had qualified to drive for Tri–State and that he should report to Tri–State's main terminal in Missouri. Upon arrival there Judy was informed that he would be working as a "contractor's driver," meaning that he would sign an agreement to drive for a lessor of tractors to Tri–State, rather than as a "company driver," which is a driver under a standard employment contract with Tri–State.[1]

Tri–State directed Judy to meet with Leroy Vanzandt, who leased tractors to Tri–State.[2] The two men met in a restaurant across from the Tri–State terminal, where Judy signed a contract with Vanzandt to the effect that he would be an "independent contractor" driving Vanzandt's tractors under the terms of the lease agree-

---

1. Tri–State owned the trailers which were pulled by both its company drivers and its contractor's drivers.

2. Tri–State was the only motor carrier to whom Vanzandt leased tractor rigs.

ment between Vanzandt and Tri–State. Under the contract, Judy was to be paid a percentage of what Vanzandt received from Tri–State. He would receive no employee benefits, and he would be responsible for paying his own self-employment and other taxes. The restaurant meeting was the only instance on which Judy actually met with Vanzandt; Tri–State gave him all of his dispatches, informed him of the times to pick up and drop off loads and the appropriate routes to take, inspected his rig, provided the necessary permits, and authorized cash advances. All of the tractors driven by Judy were marked with Tri–State's name or logo, as were the trailers that he pulled. Judy himself did not have an ICC permit, nor did he own a tractor, trailer, or any incidental equipment.

The lease agreement between Tri–State and Vanzandt provided that Tri–State would procure workers' compensation coverage and other insurance for Vanzandt's drivers, including Judy. Vanzandt in turn reimbursed Tri–State for the insurance coverage. Although Florida law prohibits an employer from charging an employee for the costs of the insurance coverage,[3] Judy's contract with Vanzandt provided that workers' compensation insurance would be withheld from Judy's compensation, possibly on the theory that the Florida statute would not apply to their relationship. When Tri–State became aware that Vanzandt was charging his "contractors" for their workers' compensation coverage, it advised Vanzandt to stop making the deduction, and he discontinued the practice.

In November of 1983, about two weeks after Judy left Missouri on his first job, he was seriously injured at a truck stop in Tuscon, Arizona, while assisting another driver, Doris Ann Valdez, who, like Judy, was pulling a Tri–State trailer with a tractor belonging to an independent owner. Valdez had just dropped off a load of structural steel. Because of the length of the steel, she had used a stretch trailer, which could be lengthened by removing pins on the sides of the trailer, locking the trailer's back wheels, pulling the front of the trailer forward, and then replacing the pins. After unloading the steel, Valdez attempted to shorten the trailer to its original length, but she was unable to retract one of the pins. She then drove to the Triple T truck stop in Tuscon, where she met Judy and Jim Williams, another truck driver. The two men offered to assist Valdez in shortening her trailer. After unsuccessfully trying several different methods to release the jammed pin, Judy crawled under the trailer in an attempt to force the pin out by striking it with a hammer. Meanwhile, Valdez had climbed into the cab and started the engine. While Judy was still underneath the trailer, the pin came free and the trailer closed, trapping Judy's head between the closing crossbeams under the trailer, and causing massive injury to his head, neck and spine.

Since the accident, Tri–State and its workers' compensation insurance carrier have been paying benefits to and on behalf of Judy; at the time of this appeal, these totaled over $180,000. On the date of Judy's accident, however, Tri–State had not yet learned that Vanzandt had been deducting the costs of Judy's workers' compensation coverage from his pay. Accordingly, this "mistake," as Tri–State characterizes it, had not yet been corrected. Because the deductions were made for the two to three week period he drove for Tri–State, Judy contends that he paid for his own workers' compensation coverage.

Judy filed suit against Tri–State and against Gary and Bonnie Burgess, the owners of the tractor driven by Valdez, on August 6, 1984. After the initial complaint was dismissed, Judy filed an amended complaint alleging that Tri–State had negli-

---

**3.** Fla.Stat.Ann. § 440.21 provides in part:

(1) No agreement by an employee to pay any portion of premium paid by his employer to a carrier or to contribute to a benefit fund or department maintained by such employer for the purpose of providing compensation or medical services and supplies as required by this chapter shall be valid, and any employer who makes a deduction for such purpose from the pay of any employee entitled to the benefits of this chapter shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.083.

gently maintained the stretch trailer pulled by Valdez, allowing the securing pin to become rusty and unlubricated. The amended complaint further alleged that Gary and Bonnie Burgess, as owners of the tractor driven by Valdez, were vicariously liable for Valdez' negligent operation of the tractor while Judy was underneath the stretch trailer. Because the Burgesses were never served with process, the trial court dismissed the case against them without prejudice.

In the months prior to trial, Judy filed three motions seeking leave to amend his complaint to add allegations that Tri–State was vicariously liable for Valdez' negligence and that Tri–State had negligently allowed the securing pin mechanism to become misaligned. The motions were denied,[4] but pending at trial was Judy's motion for rehearing on the third motion to amend. Also pending was Tri–State's motion *in limine*, seeking to limit the evidence at trial to the issues of rust and lack of lubrication on the trailer locking pin, as alleged in the amended complaint. On the first day of trial, the district court ruled that Judy would be able to try the issues of vicarious liability and misalignment, despite the previous denials of leave to amend on these issues.[5]

Although one of Tri–State's defenses was that Judy was its statutory employee and was therefore barred from a tort recovery because of the workers' compensation benefits he had received, the trial court refused to allow Tri–State to present evidence indicating the nature of its workers' compensation program, the benefits it had paid on behalf of Judy, or its lack of involvement in Vanzandt's decision to charge Judy for workers' compensation coverage. The court did, however, allow Judy to present evidence that he personally had paid for workers' compensation coverage. The jury returned a verdict in favor of Judy,[6] awarding damages in the amount of $1.8 million. The jury specifically found that Judy was not an employee or special employee of Tri–State. Regarding liability for the accident, however, Judy was found to be 37 percent comparatively negligent, while Valdez was accorded 53 percent of the responsibility (which was vicariously assigned to Tri–State), and Tri–State itself was assigned 10 percent of the blame based on its maintenance of the trailer.

After trial, Tri–State moved for judgment notwithstanding the verdict and, alternatively, for a new trial. The district court granted Tri–State's motion for judgment notwithstanding the verdict, holding that, as a matter of law, Judy must be deemed an employee of Tri–State and accordingly that his tort claim against Tri–State was barred by the exclusive remedy provision of the Florida Workers' Compensation Act, Fla.Stat.Ann. § 440.11 (1981).[7] Judy appeals from the trial court's setting aside of the jury verdict. Tri–State cross-appeals, arguing that if the trial court was in error in setting aside the jury verdict, the court should have granted its alternative motion for a new trial.

## II.

The parties on this appeal contest whether Judy, as a matter of fact or of law, was an employee of Tri–State for the purposes of Florida's workers' compensation law. Tri–State urges that, as a legal matter, Judy must be deemed its employee for the purposes of the workers' compensation law. Judy argues, on the other hand, that the jury's conclusion that he was not Tri–State's employee is supported by the evi-

---

**4.** The district court apparently did not rule on the first motion, but denied the second motion, termed a "Renewed Motion for Leave to Amend." The third motion also was denied.

**5.** Judge G. Kendall Sharp handled the pre-trial motions in this case, but shortly before trial, the case was reassigned to Judge Patricia C. Fawsett.

**6.** Judy's wife was also a plaintiff at trial, but she was not awarded any damages. She is not a part of this appeal.

**7.** Fla.Stat.Ann. § 440.11 (West 1981), *infra* note 11. *See Garcia v. Public Health Trust of Dade County,* 841 F.2d 1062, 1065 (11th Cir.1988) ("Florida law does not permit an employee receiving worker's compensation benefits to institute an action in tort against his employer or co-employee.").

dence and, as a factual matter, should not have been overturned by the district court. Although state law is ultimately determinative of this issue, federal law introduces an additional consideration into this already complex are of state law, as pointed out by the district court.

In *White v. Excalibur Insurance Co.*, 599 F.2d 50 (5th Cir.), *cert. denied*, 444 U.S. 965, 100 S.Ct. 452, 62 L.Ed.2d 377 (1979),[8] the former Fifth Circuit held, on similar facts, that a motor carrier who had leased a tractor for use in interstate commerce would be deemed the employer of the tractor's driver for the purposes of Georgia workers' compensation law, and accordingly that the driver's sole remedy would be workers' compensation under the exclusive remedy provision of the Georgia workers' compensation act. *White* was a diversity wrongful death suit brought by the mother of a driver who, during his rest period, was killed by the tort of a fellow driver then actually operating the tractor. In denying the mother's claim, the court noted that because the Interstate Common Carrier Act amendments require motor carriers to assume "full direction and control" of vehicles leased to them, the drivers of such vehicles, although they may not have been directly hired by the carrier, are deemed to be statutory employees of the carrier just as if the carrier were the owner of the vehicle. *See Simmons v. King*, 478 F.2d 857, 867 (5th Cir.1973) (driver became statutory employee of lessee, who accordingly became vicariously liable as a matter of law for the negligence of the driver).[9] Accordingly, in *White* the court determined that both drivers—the decedent and the driver actually on duty—were statutory employees of the carrier under federal law.

Under federal law, if the drivers had injured a member of the public, the lessee-carrier would be liable in tort for their negligence. *Simmons*, 478 F.2d at 866–67. In *White*, however, because the injured party was himself a statutory employee, the court held that under the Georgia law providing that workers' compensation is the exclusive remedy available to employees injured on the job, the driver's mother was barred by Georgia law from seeking a remedy apart from workers' compensation.

Although the Interstate Common Carrier Act amendments do not specifically provide that drivers of leased vehicles are the statutory employees of the lessee-carrier, the former Fifth Circuit's interpretation of the amendments is fully consistent with the federal statutory framework. The court in *White* pointed out that "Congress wished to impose on lessee-carriers responsibility for the operation of leased vehicles 'as if they were the owners of such vehicles....'" 599 F.2d at 53 (quoting 49 U.S.C. § 304(e)(2), now codified at 49 U.S.C. § 11107(a)(4)). *See also Ronish v. St. Louis*, 621 F.2d 949, 951 (9th Cir.1980) (lessee is liable for negligence of driver of its leased truck under federal law and regulations). But the court in *White* took the statutory employment question a step further, holding that "[t]o make [lessee-carriers] assume the burden of liability for the harm caused by their leased vehicles without according them the protection given employers under state substantive law

---

**8.** The Eleventh Circuit, in the in banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**9.** *White* and *Simmons* referred to amendments to the Interstate Common Carrier Act requiring a motor carrier to assume "full direction and control" of leased vehicles. 49 U.S.C. §§ 10927(a)(2) and 11107(a)(4) (formerly 49 U.S.C. §§ 315 and 304(e)(2) respectively). Congress adopted the amendments in response to efforts by interstate motor carriers to insulate themselves from liability for the negligence of their drivers by according their drivers the status of an "independent contractor." Because

such drivers frequently were insolvent, Congress passed the legislation to ensure the protection of the public in the event of accidents involving leased trucks. *See White*, 599 F.2d at 52. The regulation promulgated pursuant to these sections is now located at 49 C.F.R. § 1057.12(c)(1):

The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

would broaden their exposure to suit beyond that to which employers in fact are subject." 599 F.2d at 53. The court concluded that there is "no warrant for such strict liability in the federal law." *Id.*

It is not readily clear whether *White* held that (a) in a diversity action, the finding of a federal statutory employment relationship necessarily creates an employment relationship for the purposes of state workers' compensation law, or (b) whether state law determines if the federal relationship is sufficient to constitute employment for workers' compensation purposes. We conclude that the second interpretation is correct, although the opinion admittedly contains much language that supports the first interpretation. For instance, the court noted that although Georgia law ordinarily does not require an employer to provide workers' compensation coverage to employees of his independent contractor, "the effort by the carrier and the vehicle lessor to create by contract an independent contractor relationship cannot operate to frustrate the federal design to impose responsibility on the carrier for acts of those who might otherwise be independent contractors." 599 F.2d at 54. The court explained that "[t]he statutory employee status created by federal law may affect employer-employee relationships under otherwise controlling state statutes where direction and control of the worker by the federally regulated employer are central to the regulatory program." *Id.* at 53. The court concluded that "motor carriers who are by federal law burdened with statutory employer liability for the acts of vehicle lessors are also

entitled to the protection afforded employers by state law...." *Id.* at 51.[10]

■ We believe, however, that the better interpretation of *White* is that once a federal statutory employment relationship is found, the applicable state workers' compensation law must be analyzed to determine if the federal relationship is sufficient to bring the statutory employer within any state law provision offering protection from tort liability to employers in that state. Admittedly, where members of the public are injured by the torts of drivers of leased trucks, "the traditional common law doctrine of master-servant relationships and respondeat superior does not apply." *Price v. Westmoreland,* 727 F.2d 494, 497 (5th Cir.1984) (footnote omitted). But where, as here, one driver is injured by the tort of another driver, both of whom were driving tractors leased by the same carrier, the interests of the general public, as opposed to those of the motor carrier and its drivers, are not so deeply implicated. We endorse the holding in *White* that federal law creates a statutory employment relationship between interstate carriers and the drivers of the trucks leased to them, but we believe that whether that statutory employment relationship is sufficient to constitute an employer/employee relationship for the purposes of workers' compensation is a question of state law. Each state's workers' compensation laws may vary, and not every state may have a statute, such as is found in Georgia and Florida, conferring immunity from tort suits on employers cov-

---

**10.** Such a conclusion—that federal law mandates the recognition of the statutory employment relationship by the states—could further be inferred from *Simmons v. King,* relied upon by the court in *White:*

> The legislative-administrative travail behind the ICC regulations on trip leases reflects the importance attached by the Congress and ICC to the economic necessity for such short term leases and why it is critical that ICC regulations and the leases mandated by them have supreme, controlling significance. They grew out of the decade long ex parte proceeding No. MC–43.... Many factors ... behind this legislative-administrative determination.... were to correct abuses that had arisen under often fly-by-night arrangements with conse-

> quent damage to the development and maintenance of a sound transportation system and to the public interest from a helter-skelter operation of thousands of unregulated vehicles on the highways as a menace to safety. *Simmons,* 478 F.2d at 866–67. Finally, a subsequent decision of the new Fifth Circuit, *Price v. Westmoreland,* 727 F.2d 494, 497 (5th Cir.1984), has explained *White* as holding that "the policy underlying the ICC regulations and the *Simmons* rule did not apply to co-employees of motor carriers injured by their fellows' negligence since they could recover from their employer in workmen's compensation." The explanation in *Price* seems to indicate further that the rule laid down in *White* applies universally.

ered by the workers' compensation laws.[11] Although there exists a definite federal interest in maintaining a safe highway system, the federal interest does not extend into the operation of state workers' compensation laws. And, despite its implications to the contrary, we believe that the opinion in *White* supports such a conclusion.

The court in *White* referred to the Fifth Circuit's prior decision in *Ward v. Kraftco*, No. 77–1743 (5th Cir. Sept. 6, 1977) (unpublished opinion) (Table at 559 F.2d 1215), which held that a driver in a position analogous to the deceased driver in *White* was a statutory employee under Georgia law, thus limiting his recovery to workers' compensation. The court in *White* then analogized that the federal interpretation would equally be recognized in Georgia: "Similarly here, because [the decedent] was a statutory employee of Superior by virtue of 49 U.S.C. § 304(e), his mother is barred by Georgia law from seeking a remedy apart from workmen's compensation." 599 F.2d at 53. However, the Georgia decisions recognizing the statutory employment relationship between carriers and the drivers of their leased trucks do so on the basis of federal law; essentially Georgia has accepted the federal statutory employment relationship as sufficient to create a statutory employment relationship under Georgia law. *See Ward v. Kraftco*, slip op. at 2; *Dove v. National Freight Lines, Inc.*, 138 Ga.App. 114, 225 S.E.2d 477 (1976). Accordingly, we conclude that *White* does not mandate the conclusion that federal law is binding on a determination of employment under state workers' compensation law.

Florida courts, in fact, have held that the mere presence of a federal statutory employment relationship is insufficient in and of itself to create an employment relationship under the Florida workers' compensation act. In *Empire Fire & Marine Insurance Co. v. Truck Insurance Exchange*, 462 So.2d 76 (Fla.Dist.Ct.App.1985), the court followed case law holding that the ICC regulations require a motor carrier to be fully responsible throughout the duration of its lease for the injuries caused by its drivers, but found it unnecessary to adopt as an alternative holding that, as in *Simmons*, the driver of the leased truck necessarily became the statutory employee of the lessee. 462 So.2d at 79–80. Additionally, in *Bryant v. Refrigerated Transport Co.*, 418 So.2d 281, 284 (Fla.Dist.Ct. App.), *petition dismissed*, 421 So.2d 518 (Fla.1982), the court specifically stated that the ICC regulations "standing alone are insufficient to turn [the lessor's] drivers into employees of [the lessee]. [The regulations] may be considered in conjunction with other elements of the relationship in determining the status of an individual worker, but they do not necessarily imply the existence of an employer/employee relationship."

■ Accordingly, although we find that Judy was a federal statutory employee of

---

**11.** *See* Fla.Stat.Ann. § 440.11 (West 1981), which provides in part:

(1) The liability of an employer prescribed in s. 440.10 shall be exclusive and in place of all other liability of such employer to any third-party tortfeasor and to the employee, the legal representative thereof, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or the legal representative thereof in case death results from the injury, may elect to claim compensation under this chapter or to maintain an action at law or in admiralty for damages on account of such injury or death.

*See also* Ga.Code Ann. § 34–9–11 (1982):

The rights and the remedies granted to an employee by this chapter shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents, or next of kin, at common law or otherwise, on account of such injury, loss of service, or death; provided, however, that no employee shall be deprived of any right to bring an action against any third-party tortfeasor, other than an employee of the same employer or any person who, pursuant to a contract or agreement with an employer, provides workers' compensation benefits to an injured employee, notwithstanding the fact that no common-law master-servant relationship or contract of employment exists between the injured employee and the person providing the benefits.

Tri–State,[12] we turn to a consideration of Florida law to determine whether his relationship with Tri–State may properly be characterized as one of employment for the purposes of workers' compensation.

### III.

### A.

■ The district court, in granting Tri–State's motion for judgment notwithstanding the verdict, concluded that in Florida [13] the question of whether an employment relationship has been created for the purposes of workers' compensation benefits is a determination of law rather than of fact. Because, as discussed below, we agree with this determination, we find that the issue was properly removed from the jury's consideration by the granting of judgment notwithstanding the verdict.

At first appearance, Florida case law seems inconsistent as to whether the determination of employment status is for the judge or for the finder of fact. *Compare Southern Standard Life Insurance Co. v. Holloman,* 149 So.2d 887, 889 (Fla.Dist.Ct. App.1963) ("The determination of any individual's status as an employee within the contemplation of the Workmen's Compensation Act is a judicial determination to be reached from a consideration of all of the evidence presented to the proper judicial forum.") *with Pearson v. Harris,* 449 So.2d 339, 342 (Fla.Dist.Ct.App.1983) ("the existence of an employer-employee relationship is normally one for the jury....."). The matter is complicated by the fact that many cases involving employment status in the context of workers' compensation laws are appealed from the Industrial Relations Commission, where a deputy commissioner

has made both the legal and factual determinations.

We are convinced, however, that the weight of authority supports the conclusion that the determination of employment status under the workers' compensation act is a question of law. In *Hamilton v. Shell Oil Co.,* 233 So.2d 179 (Fla.Dist.Ct.App.), *cert. denied,* 237 So.2d 762 (Fla.1970), the court held that where there is no dispute as to any of the underlying facts, the plaintiff's contention that the defendant should not be labeled an "employer" within the meaning of the workers' compensation law "is not a question of fact for the jury to decide; it is a question of law which must ultimately be decided by the court." 233 So.2d at 181. The *Hamilton* holding is buttressed by the Florida Supreme Court's decision in *Booher v. Pepperidge Farm, Inc.,* 468 So.2d 985 (Fla.1985), affirming the District Court of Appeals' determination that the trial court erred in denying the defendant's motion for directed verdict. In *Booher,* the court stated that the defendant, who claimed to be the plaintiff's "special employer" for the purposes of the workers' compensation laws, "was entitled to a directed verdict on this issue as a matter of law." 468 So.2d at 985.[14]

Even the cases holding that the question of employment is a factual determination are distinguishable from the ones relied on above. Although the *Pearson* case, for instance, dealt with workers' compensation issues, in stating that the question of employment was for the jury, the court relied on a case dealing with employment under the traditional common law of master and servant, rather than with employment status under the workers' compensation

12. We also conclude that Doris Ann Valdez was a federal statutory employee of Tri–State. However, it is unnecessary for us to determine her status under Florida law given our conclusion that Judy is an employee of Tri–State under Florida law. Because of Judy's status as an employee for workers' compensation purposes, his remedy against Tri–State is limited to workers' compensation, regardless of Valdez' status.

13. At trial, the district court found, and the parties agreed, that Florida law applied to this case. On appeal, Tri–State has suggested that

Missouri law more properly applies, but we reject this contention.

14. *Cf. Hilldrup Transfer & Storage v. Florida Dep't of Labor,* 447 So.2d 414, 415 (Fla.Dist.Ct. App.1984) (for purposes of determining whether truck drivers are employees within the meaning of the unemployment tax statute, because the facts are essentially undisputed, "[t]he decision therefore depends upon the legal relationship that the undisputed facts engender.").

laws.[15] And in *Thundereal Corp. v. Sterling*, 368 So.2d 923 (Fla.Dist.Ct.App.), *cert. denied*, 378 So.2d 350 (Fla.1979), where all parties agreed that the plaintiff was an independent contractor rather than an employee, the jury was presented with the issue of coverage under an insurance contract, and not required to make an interpretation of employment status under the workers' compensation laws.

### B.

Florida courts look to all the circumstances of a relationship to determine whether a worker is an employee or an independent contractor. *Justice v. Belford Trucking Co., Inc.*, 272 So.2d 131 (Fla. 1972). However, "[t]he ultimate distinction between an employee and an independent contractor is whether the person is free from control with regards to the details of the engagement." *Maldonado v. Jack M. Berry Grove Corp.*, 322 So.2d 608, 610 (Fla.Dist.Ct.App.1975), *quashed, cause remanded on other grounds*, 351 So.2d 967 (Fla.1977). The other main factors relevant to the consideration of an employer-

employee relationship are " '(1) whether or not a contract for hire, express or implied, exists between the employee and the alleged special employer, (2) whether or not the work being done at the time of the injury was essentially that of the alleged special employer, and (3) whether or not the power to control the details of work being done at the time of the accident resided in the alleged special employer.' " *Hamilton v. Shell Oil Co.*, 233 So.2d at 181 (quoting *Hamilton v. Shell Oil Co.*, 215 So.2d 21 (Fla.Dist.Ct.App.1968)).[16] Of course, as noted in *Bryant*, the ICC regulations, requiring the lessee of a truck to maintain control over the driver, also may be considered in determining the driver's status.[17] 418 So.2d at 284. Importantly, the Florida Supreme Court has recently reiterated the necessity of "[l]ooking through form to substance"[18] to determine whether an employment relationship exists. *See Booher v. Pepperidge Farm, Inc.*, 468 So.2d 985 (Fla.1985) ("The actual employment relationship rather than the subjective intent of the parties should control in any determination of whether a special employee may sue the special employer for

---

**15.** *Saudi Arabian Airlines v. Dunn*, 438 So.2d 116, 119 (Fla.Dist.Ct.App.1983). *See also Carroll v. Kencher*, 491 So.2d 1311, 1313 (Fla.Dist.Ct. App.1986) (relying on *Pearson* for proposition that "[w]hen there are varying inferences and conclusions which can be drawn from the facts, ... the issue of whether an individual is an employee or an independent contractor should be submitted to the jury.").

**16.** A more extensive set of factors is provided in *Stevens v. International Builders of Florida, Inc.*, 207 So.2d 287, 289 (Fla.Dist.Ct.App.), *cert. dismissed*, 217 So.2d 101 (Fla.1968):
(a) The extent of control which, by the agreement, the master may exercise over the details of the work.
(b) Whether or not the one employed is engaged in a distinct occupation or business.
(c) The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision.
(d) The skill required in the particular occupation.
(e) Whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work.
(f) The length of time for which the person is employed.

(g) The method of payment, whether by time or by the job.
and.
(h) Whether or not the work is a part of the regular business of the employer.

**17.** The district court also concluded, based on language in *Bryant*, that the liability to secure workers' compensation coverage for workers is an indicator of an employee-employer relationship. This factor, however, is generally considered in cases discussing a general contractor's obligation to provide coverage for a subcontractor's employees, a matter dealt with specifically by statute. *See Bryant*, 418 So.2d at 283–84. Moreover, as made clear in *Lingold v. Transamerica Ins. Co.*, 416 So.2d 1271, 1272 (Fla.Dist.Ct.App.1982), any "actual" employer is required to provide workers' compensation when it "employs laborers under direct supervision and control." Accordingly, the liability to secure workers' compensation coverage seems inadequate as part of a test for employment under the workers' compensation act, for it focuses more on the result of being found an employer rather than indicating who exactly should be labeled an employer.

**18.** *Justice*, 272 So.2d at 136.

work-related injuries."). Thus, the fact that a contract may characterize a worker as an independent contractor rather than as an employee is not of controlling significance.[19]

■ In this case, the undisputed facts support the district court's conclusion that Judy was Tri–State's employee for the purposes of Florida's workers' compensation act. Judy had just delivered a Tri–State load at the time of the accident, and it seems reasonably clear that, had he not been injured, he would have continued driving for Tri–State under his contract.[20] Similar to the truck driver in *Justice,* Judy used trailers supplied to him by Tri–State, and he was required to comply with all of Tri–State's rules and regulations, as well as with the terms of Vanzandt's lease agreement with Tri–State, which was to be carried in Judy's permit book. Tri–State issued all of Judy's dispatches, provided the times to pickup and drop off his loads, directed him as to which routes to take, provided any required permits, and authorized cash advances. In addition, Tri–State solicited customers and entered into and performed contracts with those customers without interference from Judy or Vanzandt. Accordingly, it is clear that Judy was subject to Tri–State's direction and control not only in obtaining the intended result of his work, but also in the means used to achieve that result. *See Randell, Inc. v. Chism,* 404 So.2d 175, 177 (Fla.Dist. Ct.App.1981). Moreover, Judy did not have an ICC permit, nor did he own any of his equipment. *Cf. A Nu Transfer, Inc. v. Dep't of Labor & Employment Security Div.,* 427 So.2d 305 (Fla.Dist.Ct.App.1983)

(court found worker to be independent contractor; unlike Judy, worker provided his own vehicles and paid for his own maintenance, repairs, gasoline, oil, tires, licenses, equipment, and gear).[21] Although we have considered that Judy was paid on a per job basis, that income taxes were not withheld from his salary, and that his contract referred to him as an independent contractor, we are not persuaded that a non-employment relationship existed, especially considering the Florida Supreme Court's admonition to look to the "actual employment relationship" rather than to the "subjective intent of the parties." *Booher,* 468 So.2d at 985.

The district court also found that there was an implied, if not express, contract between Tri–State and Judy, and we cannot say that this conclusion is erroneous. As the district court explained:

> The contract between Judy and Vanzandt's Transit obligated Judy to operate the truck rig subject to the terms of the Lease Agreement between Vanzandt and Defendant Tri–State. Under the terms of both contracts, Judy was apprised that he was driving a rig leased to Tri–State exclusively for one year unless the contract was earlier terminated, hauling loads of freight for Tri–State, and operating such rig in accordance with Tri–State's directions. Thus, although he was designated as an independent contractor, by signing such agreement Judy agreed to be subject to the direction of Tri–State. He, therefore, as a matter of state law expressly as well as by implication agreed to an employment relationship with Tri–State sufficient to satisfy

---

19. The *Booher* decision disapproved, to the extent the decisions were in conflict, *Thornton v. Paktank Florida, Inc.,* 409 So.2d 31 (Fla.Dist.Ct. App.1981), where the court had held that "even if the borrowing employer fully controlled the detail of an employee's work, when there is no contract of hire between the employee and the alleged special employer and the contractual arrangements between the two employers expressly provide that the employee is not to be considered an employee of the alleged special employer, the borrowing employer is not the 'special employer.'" *Bryant,* 418 So.2d at 284.

20. Although Judy's contract could be cancelled at any time upon "reasonable" notice, the contract was to be in effect for one year.

21. *See also Barrow v. Shel Products, Inc.,* 466 So.2d 281, 282 (Fla.Dist.Ct.App.1985) (finding trucking company to be statutory employer of driver of leased truck); *Wooden v. Ploof Truck Lines, Inc.,* 482 So.2d 611 (Fla.Dist.Ct.App.1986) (remanding for reconsideration of statutory employment issue in light of *Barrow* ).

the requisites of the Florida Workers' Compensation Act.

■ Furthermore, we reject Judy's contention that he could not be Tri–State's employee for the purposes of the workers' compensation act because he paid for his workers' compensation coverage himself, through payroll deductions. In the *Justice* decision, the Florida Supreme Court found the truck driver to be an employee of, rather than an independent contractor for, a trucking company, notwithstanding the fact that deductions from his pay were made for workers' compensation coverage. 272 So.2d at 133. Although Fla.Stat.Ann. § 440.21 invalidates any agreement by an employee to pay any portion of his workers' compensation premium, Tri–State was unaware of Vanzandt's deduction of workers' compensation premiums from Judy's pay. In fact, once Tri–State learned that Vanzandt was making such a deduction, it notified him that he should stop doing so immediately. Considering that Tri–State procured the coverage and that its insurer has been paying Judy's benefits, the fact that deductions were made from Judy's pay does not alter our conclusion that he was Tri–State's statutory employee.[22]

### IV.

For the foregoing reasons, we AFFIRM the judgment of the district court. Because we have denied appellant's requested relief, we find it unnecessary to discuss appellee's cross-appeal.

---

22. *Cf. Heaton v. Home Transportation Co.,* 659 F.Supp. 27 (N.D.Ga.1986) (relying on Georgia authority, fact that driver paid his own workers' compensation insurance premium did not alter his status as a statutory employee for workers' compensation purposes).